(50 App. Div. 380.)

## PEOPLE ex rel. PERCIVAL v. CRAM et al., Commissioners.

(Supreme Court, Appellate Division, Second Department.   April 14, 1900.)

1. MUNICIPAL CORPORATIONS—OFFICERS AND EMPLOYEES — REMOVAL —CIVIL-SERVICE RULES—MANDAMUS.

Under Laws 1899, c. 370, § 6, subd. 1, authorizing the state civil-service commission to prescribe suitable regulations for carrying the act relating to the appointment and removal of state and city officers under civil-service rules into effect, and declaring that such regulations shall have the force of law, the municipal civil-service commissioners of the city of New York have authority to enact, subject to the approval of the state commission, a rule providing that no person in the classified service in such city shall be removed from office until a statement of the causes of such removal shall be filed with the municipal commission, and a copy of the same furnished to the person sought to be removed, and until he has an opportunity to present an explanation in writing; and hence a person removed without compliance with such rule, and without a hearing, is entitled to reinstatement by mandamus.

2. CONSTITUTIONAL LAW—DELEGATION OF LEGISLATIVE AUTHORITY—CIVIL SER-VICE RULES.

The legislature has power to delegate to the state and municipal civil-service commissioners authority to enact and enforce rules governing the appointment of public officers, their tenure in office, and removal there-from, and the delegation of such power is not a delegation of its legis-lative functions, but is a delegation of its administrative powers and duties.

3. MUNICIPAL CORPORATIONS—REMOVAL FROM OFFICE—CIVIL SERVICE—REGU-LATIONS.

Greater New York Charter, § 1543, provides that the heads of all depart-ments shall have power to appoint and remove all officers and employés in their respective departments, without reference to the tenure of office, and, in case of a removal, the true grounds thereof shall be forthwith entered on the records of the department.   Rule 42 of the civil-service commission of Greater New York provides that no removal of any person in the classified service of the city shall be valid until a statement of the causes of such removal shall be filed with the commission, and a copy of the same furnished to the persons sought to be removed, and until such person has had an opportunity to present an explanation in writing.   *Held,* that the removal of a dock master by the commissioners of docks and fer-ries, without notice and an opportunity to be heard, and without causes assigned and filed with the civil-service commissioners, is unlawful, though the grounds of such removal were entered on the records of the commis-sioners of docks and ferries.

Bartlett, J., dissenting.

Appeal from special term, Kings county.

Application by the people, on the relation of Thomas J. Percival, for mandamus against J. Sergeant Cram and others, as commis-sioners of the department of docks and ferries of New York City. From a judgment granting the application (61 N. Y. Supp. 858), re-spondents appeal.   Affirmed.

Argued before GOODRICH, P. J., and BARTLETT, HATCH, and HIRSCHBERG, JJ.

William J. Carr, for appellants.
Joseph A. Burr, for respondent.

GOODRICH, P. J.   The relator, on September 14, 1899, obtained an order directing the defendants herein to show cause why a per-emptory writ of mandamus should not issue commanding the said

defendants, as commissioners of the department of docks and ferries of the city of New York, to reinstate and assign him permanently to a district in the borough of Brooklyn, to put his name on the pay roll, and to audit and pay to him the compensation of such position from the date of his discharge. No return was filed by the defendants, but the parties at the hearing made a stipulation as to the facts upon which the decision of the application was to be determined, so that we need not regard any of the allegations of the relator's affidavit. The special term directed the issuance of a peremptory writ of mandamus commanding the defendants to reinstate the relator as dock master in the department of docks and ferries, and assign him to duty therein, and to prepare and certify a pay roll for the amount of his salary from September 1, 1899. From this order the defendants appeal.

The decision of the special term was based upon the following stipulation:

"The parties hereto do stipulate and agree that the following are the facts upon which the decision of this application is to be determined:

"(1) That each of the relators, except the relator Thomas J. Percival, was a dock master in the department of finance in the city of Brooklyn, prior to the going into effect of the present Greater New York charter, and the said Percival was a dock master assigned to act as superintendent of docks at the same salary as that paid to other dock masters.

"(2) That prior to the 31st day of December, 1897, pursuant to the provisions of section 1536 of the said charter, the officers therein named, including the mayor of the city of Brooklyn, adopted and filed a plan for the transfer of these relators to perform as nearly as might be the same services in the same part of the city, and to hold the same relative rank and position in the said city, as constituted by the Greater New York charter, as they held and performed at the time the various municipalities were consolidated into one by said act and the plan of apportionment determined upon.

"(3) That, through error, these relators were assigned to the department of finance of the city of New York instead of the department of docks and ferries, as contemplated by said act or said plan of transfer.

"(4) That each of the relators continued to act in the same position and to discharge the same duties as he had performed and discharged prior to the 1st day of January, 1898, until at various dates, between the 8th and 28th days of January, 1898, the above relators were discharged, removed, and dismissed, or attempted to be discharged, removed, and dismissed, from the service of the city of New York by the comptroller of the said city.

"(5) Subsequently, in obedience to a writ of mandamus issued out of the supreme court, the mayors and other officers of said board of transfer, as aforesaid, corrected the error made as aforesaid, and transferred each of the relators to the department of docks and ferries of the city of New York, such correction and transfer to date and take effect, as provided in said order, from the day and date on which said plan of transfer and assignment was determined upon.

"(6) That thereafter, and about August 7, 1899, the defendants above named, as commissioners of the department of docks and ferries of the city of New York, reinstated each of the said relators as dock masters in the department of docks and ferries of the city of New York, such reinstatement to take effect from July 1st, and each of the said relators were thereafter directed to report for duty, but none of them have been assigned to active duty in the borough of Brooklyn, or at any place within the city of New York.

"(7) That under the provisions of section 1536 of the Greater New York charter it was, among other things, provided that the incumbents of positions abolished or made unnecessary by said act should be preferred for appointment to positions demanding their services, and that for that purpose the civil-service commission was directed, so far as practicable, to place the names

of such persons upon the proper eligible list, and to give them on such list the preference, after veterans.

"(8) That on or about the 5th day of March, 1898, the municipal civil-service commissioners of the city of New York made certain rules and regulations which were approved by the mayor of the city, under which the positions of the relators were classified in the schedule of positions subject to competitive examinations; and subsequently thereto, and on or about the 11th day of July, 1899, in pursuance of the provisions of law, certain other municipal civil-service rules for the city of New York were approved by the said civil-service commissioners, and in and by the said rules and regulations the positions of relators were also classified in the schedule of positions subject to competitive examinations; and among other rules and regulations adopted as aforesaid was rule known as 42, which, among other things, provided as follows: 'To secure compliance with the provisions of the civil-service law prohibiting removals because of political opinions or affiliations, no removal of any person in the classified [civil] service of the city of New York shall be valid unless and until a statement of the causes of such removal shall be filed with the municipal commission, and a copy of the same furnished to the persons so [sought] to be removed, and until said [such] person has been afforded an opportunity to present an explanation in writing.'

"(9) That subsequently to the 9th day of January, 1898, and prior to the 17th day of June, 1899, the names of the relators, who were former dock masters of the city of Brooklyn, were placed upon the list in the office of the municipal civil-service commission of those persons eligible to appointments as dock masters.

"(10) That on June 17, 1899, the defendants and respondents appointed to service as dock masters William Capels and eight other persons, and fixed the pay or compensation of each at $1,500 a year; that neither of the said persons appointed as aforesaid were dock masters at the time of the going into effect of the Greater New York charter. The relators were properly in the service of the city of New York as dock masters.

"(11) That on September 1, 1899, each of the relators received from the defendants and respondents a letter of discharge and dismissal, a copy of which is hereto annexed, marked 'Exhibit C'; and neither of the said relators received any other notice of discharge or dismissal, and no statement of the causes of their removal as dock masters was filed with the municipal civil-service commission, and no copy of such statement was furnished to either of the relators, and neither of the said relators has been afforded an opportunity to present an explanation in writing, as provided by rule 42, above referred to.

"(Exhibit C.)

"The City of New York, Department of Docks and Ferries.

"Pier A, N. R., Battery Place.

"New York, Sept. 1, 1899.

"Thomas J. Percival, Esq., No. 688 Leonard Street, Brooklyn, N. Y.—Sir: At a meeting of the board of docks held this day, the following preambles and resolutions were adopted: 'Whereas, at a meeting of the board of docks held August 7, 1899, in accordance with the opinion of the corporation counsel dated August 4, 1899, Charles E. Alsberge, Leonard Becker, William J. Cox, George K. Copelan, Abraham Miller, Henry Nahe, Jr., Thomas J. Percival, Edward Staufer, and John Wallace were reinstated as dock masters as of July 1, 1899; and whereas, the dock superintendent, under date of August 31, 1899, reports that the effect of such reinstatement is to increase the force of dock masters beyond the necessities of this department: Resolved, that Charles E. Alsberge, Leonard Becker, William J. Cox, George K. Copelan, Abraham Miller, Henry Nahe, Jr., Thomas J. Percival, Edward A. Staufer, and John Wallace be, and they are hereby, discharged from the service of this department, in accordance with said opinion of the corporation counsel dated August 4, 1899, as their services are superfluous and unnecessary, to take effect at once; resolved, that the secretary be, and he hereby is, directed to file in the records of this department the reason for such discharge, and to give notice thereof to the persons holding the positions so abolished.'

"Yours, respectfully,                              Wm. H. Burke, Secretary."

"(12) That prior to the commencement of these proceedings each of the relators caused to be served upon the defendants and respondents a notice of demand for reinstatement, but the said defendants and respondents have refused to reinstate either of said relators, but have retained in their employ the other dock masters appointed as aforesaid."

The opinion of the learned justice at special term states the appellants' ground of appeal to be a challenge of the authority or right of the civil-service commissioners to make rule 42, as in "so doing they exceeded their powers, and embarked in the business of legislating themselves, and thus attempted wrongfully to add to the law." Upon this point our decision must depend.

The relator was transferred to the dock department under section 1536 of the Greater New York charter, which provides that the transfer should be "subject, nevertheless, to removal in accordance with the provisions of this act, for cause, or to abolish unnecessary positions." Section 1543 confers power upon the deputy "heads of all departments  *   *   *  to appoint and remove all   *   *   *  officers, employés and subordinates in their respective departments, except as herein otherwise specially provided, without reference to the tenure of office of any existing appointee,   *   *   *  and in every case of a removal, the true grounds thereof shall be forthwith entered upon the records of the department or board. In case of removal, a statement, showing the reason therefor, shall be filed in the department." This provision, so far as quoted, appears in section 28 of chapter 335 of the Laws of 1873, in section 48 of the consolidation act of 1882 (chapter 410), as well as in section 1543, referred to.

In People v. Board of Fire Com'rs of the City of New York, 72 N. Y. 445, the section of the act of 1873 was under consideration, in 1878. We quote at length the language of the opinion of the court, written by Judge Allen (page 448):

"It is also required that, in every case of removal, the true grounds thereof shall be forthwith entered upon the records of the department, and a statement showing the reason thereof shall be filed in the department. We cannot agree with the counsel of the appellants that this restriction is 'shadowy and unsubstantial,' and this expression of the legislative will inoperative and ineffectual. It was intended as a substantial limitation of the general power of removal, conferred by the same section upon the several departments of the city government, and to secure the continuance in office of the persons named until a reasonable cause, other than the pleasure of the heads of the departments, or a change in the political character of the majority, should exist for their removal. The intent of the provision was to continue in the subordinate but important positions of the city government those who had proved themselves faithful and trustworthy, as well as competent to discharge the duties of their stations. The provision may be imperfect in prescribing the details of the proceedings for a removal, but it is capable of execution in a way to give full effect to the intent of the legislature, secure the officers named against removal without cause, without in any way detracting from the necessary powers vested in the heads of the departments, and who are responsible for their due administration, if those having the execution of it are disposed in good faith to respect the statute and the rights of the officers named in the restrictive clause."

We have thus an authoritative declaration that the restriction upon removals in section 1543 of the charter is not "shadowy and

unsubstantial," but a substantive limitation of the power of removal in the event of a change in the political character of the majority. This was announced before the civil-service act of 1883, and before the embodiment in the constitution of the principle of the civil-service law. It is a curious fact that, while the section of the constitution (article 5, § 9) provides for appointments and promotions in the civil service, it does not mention removals.

Section 123 of the charter provides for the appointment of municipal civil-service commissioners, and section 125 requires them to report to the state civil-service commission from time to time, and, whenever the latter may require, "the manner in which the civil-service law, and the rules and regulations thereunder, have been and are administered, and the results of their administration in such city, and of such other matters as said commission may require, * * * and it shall be the duty of said state commission in its annual report to set out either of these reports. * * * It shall be the duty of all persons in the official service of the city to conform to and comply with said rules and regulations and any modifications thereof made pursuant to the authority of this section or said rules and regulations, and to aid and facilitate in all reasonable and proper ways the enforcement of said rules and regulations and any modification thereof."

This brings us to a consideration of the act commonly known as the "White Law" (chapter 370, Laws 1899), which was intended to be a complete codification of the civil-service law. There can be no question, under sections 2, 8, and 10 of that act, that the relator's position is included in the classified service of the city. By section 23, no "removal from an office or employment, within the scope of the rules established as aforesaid, shall be in any manner affected or influenced by" the political opinions or affiliations of any person whatever. Section 10 provides for the appointment, by the mayor of each city, of municipal civil-service commissioners to prescribe rules for appointment and promotion in the civil service, which are to be subject to the approval of the state civil-service commissioners; and the municipal commission is required to make reports to the state commission from time to time, and whenever the latter may request, "of the manner in which this law, and the rules and regulations thereunder, have been and are administered, and the results of their administration in such city, * * * and it shall be the duty of said state commission in its annual report to set out either these reports, or a sufficient abstract or summary thereof, to give full and clear information as to their contents."

Thus, by the White law as well as by the charter, reciprocal and corresponding duties are imposed upon the municipal commission to report to the state commission, and upon the latter to report to the governor, according to the reports sent by the former body. Still greater power is conferred by section 10 of the White law, which authorizes the state commission, with the approval of the governor, to remove any municipal civil-service commissioner for violation of the provisions of the act or of the rules in force thereunder. Section 6 provides that:          -

"The state civil-service commission shall—First, prescribe, amend, and enforce suitable rules and regulations for carrying into effect the provisions of this act, and of section nine of article five of the constitution of the state of New York, as herein provided.  The rules prescribed by the state and municipal commissions pursuant to the provisions of this act shall have the force and effect of law."

Under this authority, rule 42 was adopted by the municipal commission of the city of New York, and approved by the state commission.  The first part reads as follows:

"To secure compliance with the provisions of the civil-service law prohibiting removals because of political opinions or affiliations, no removal of any person in the classified service of the city of New York shall be valid unless and until a statement of the causes of such removal shall be filed with the municipal commission and a copy of the same furnished to the person sought to be removed and until such person has been afforded an opportunity to present an explanation in writing."

It goes without saying that the legislature cannot delegate the power to adopt any rule in conflict with its own act.  The question here is whether authority to make rule 42 was within the four corners of the White law, and in conformity with and essential to carry out·and enforce the provisions of that law.  It is claimed by the appellants that this rule was ultra vires of either of the commissions, while the relator contends that the White law conferred the power of making any rule which was essential to the enforcement of its provisions, and that this rule comes within that category.

In the schedule attached thereto, the White law repeals chapter 186 of the Laws of 1898.  That chapter contained a section as follows:

"Sec. 13. No recommendation or question under the authority of this act shall relate to the political opinions or affiliations of any person whatever; [and if a person holding a position subject to competitive examination in the civil service of the state or of a city shall be removed or reduced the reasons therefor shall be stated in writing and filed with the head of the department or other appointing officer, and the person so removed or reduced shall have an opportunity to make an explanation.]"

The White law does not contain the bracketed provision of the law of 1898, but the other part of section 13 is made a part of section 23 of the White law, and is followed by the clause:

"And no appointment or selection to or removal from an office or employment within the scope of the rules established as aforesaid, shall be in any manner affected or influenced by such opinions or affiliations."

There is no doubt that the repeal by the legislature of the bracketed clause is significant.  We may not assume that it was unintentional.  We think we may find the reason in the fact that, as the White law was intended as a codification of all the civil-service law, it was deemed unnecessary to re-enact this clause because the legislature intended to and did, by section 6, subd. 1, confer upon the civil-service commissions the power to make such a rule and all rules necessary to enforce the provisions of the act itself and the article of the constitution, such rules to "have the force and effect of law." It was intended that such power should be exercised according to the varying conditions of the civil service from time to time, without the passage of new acts by the legislature.

But it is insisted that the legislature had no power to confer upon any department of the government or any municipal body its own inherent power of legislation; in other words, to delegate its own functions. This depends upon the question whether the legislature has attempted in the White act to do so.

The first civil-service law in this state (chapter 354, Laws 1883) imposed upon the governor the power of making rules for carrying the act into effect, and such rules were made by Gov. Cleveland, and continued in force for many years. The act of 1884, c. 410, authorized the mayor of each city to make rules for the admission of persons into the civil service of the city, which should take effect upon their approval by the New York civil-service commission. Again, in 1897 (chapter 428), the civil-service commissioners were empowered to establish rules and regulations subject to the approval of the governor, and such rules were made by Gov. Black, and continued till the White law. We have been unable to find any case where the delegation of the power to make rules as above stated was ever questioned. In February, 1885, the justices of the supreme judicial court of Massachusetts, in answer to the request of the house of representatives of the commonwealth for an opinion as to the constitutionality of an act authorizing commissioners to prepare civil-service rules, said:

"We think the legislature has the constitutional right to provide for the appointment of such commissioners, and to delegate to them the power to make rules, not inconsistent with existing laws, to guide and control their discretion and the discretion of the officers of the state or of the cities in whom the appointing power is vested. This is not a delegation of the power to enact laws; it is merely a delegation of administrative powers and duties." 138 Mass. 601, 603.

It is well settled that the power conferred upon the legislature to make laws cannot be delegated by that body to any other body, and that, where the sovereign power of the state has located the authority, there it must remain. Cooley, Const. Lim. p. 137; Locke on Civil Government, § 142. But it can hardly be disputed that the legislature can devolve upon another branch of the government the power to make rules for carrying out the mandate of its own act. It has such power, and has exercised it unchallenged, or, if it has been challenged, the power has been approved and sanctioned by the courts, as will be seen hereafter.

It should not be forgotten that the state civil-service commission is a state official body, and the municipal civil-service commission a municipal official body, and that each is a branch or department of the government. Even upon quasi public corporations, the legislature has conferred the power of making by-laws not inconsistent with their charters and the general laws of the state. Mr. Sedgwick, in his treatise on the Construction of Statutory and Constitutional Law (page 395), says: "It is well settled that in many cases a certain amount of legislative power may be intrusted to municipal corporations." So, also, Judge Dillon states that, while it is true that the legislature of a state is alone competent to make laws, yet it is settled that it is competent for the legislature to delegate to municipal corporations the power to make by-laws and ordinances

which, when authorized, have the force of laws passed by the legislature. 1 Dill. Mun. Corp. § 308. Such a power was conferred upon the old city of New York in all its charters, ancient and modern, and the same power is conferred upon the present city by the Greater New York charter (section 49).

It is equally apparent that the legislature may devolve upon other departments of the state government some powers which it might itself have exercised, where such powers are cognate to the statute. A familiar illustration of such a devolution is the conference of power upon courts to make rules of practice for the regulation of their business. We think, therefore, that it was well within the power of the legislature to empower the state and municipal civil-service commissions to make rules to effectuate the purpose of the act, and that the rule in question is designed to have that and no other effect.

Another principle laid up among the fundamental elements of the law is that, whenever a power is given or a duty imposed by statute upon a department of the government, everything necessary or essential to the exercise of the power or the performance of the duty is conferred by implication upon such department, in the absence of express words. Mr. Endlich, in his Interpretation of Statutes (pages 589, 591), says that whatever is implied in a statute in the way of a grant is made as much a part of the enactment as what is expressed therein, and that nothing should be held ultra vires, unless expressly prohibited, which is fairly incidental to those things which the legislature has authorized. In Mayor of New York v. Sands, 105 N. Y. 210, 11 N. E. 820, it was held that an act authorizing the comptroller of the city to issue bonds, conferred upon him by implication the right to employ brokers to effect a sale of the bonds, quoting the remark of Domat, that "all laws necessarily bear with them all the powers or incidents necessary to carry out their intention"; and Sedg. St. & Const. Law, p. 228, to the effect that, where a statute commands an act to be done, it authorizes all that is necessary for its performance; also, Potter, Dwar.: "In statutes incidents are always supplied by intendment; in other words, wherever a power is given by statute, everything to the making of it effectual is given by implication." In Stief v. Hart, 1 N. Y. 20, it was said (page 30): "Whenever a power is given by statute, everything necessary to making it effectual or requisite to attain the end is implied." In People v. Hicks, 15 Barb. 153, it was said by Justice Roosevelt (page 164): "The grant of an express power carries with it, by necessary implication, every other power necessary and proper to the execution of the power expressly granted." People v. Chapin, 105 N. Y. 309, 11 N. E. 510, is still more specific. The action related to an act requiring the state comptroller to cancel tax sales where the same were invalid, on receiving evidence of the invalidity. The court held that he had legal authority to receive and act upon affidavits; that he was authorized to decide the question of validity; that this was a judicial function; that (page 316, 105 N. Y., and page 513, 11 N. E.) "it is a general principle that, where power is given by statute, everything necessary to make it effectual, or requisite to

attain its end, is implied [citing cases supra].     To enable him to decide whether or not the tax sales were invalid for any cause whatever, and ineffectual to give title, it was necessary that he should receive evidence of the facts showing their invalidity." In Armstrong v. Village of Ft. Edward, 159 N. Y. 315, 53 N. E. 1116, a similar decision was made in respect to the power of a village board of water commissioners to sell water bonds. It was held that the power to sell carried with it the power to employ reasonable assistance, not limited to the employment of a broker.

The White law (section 6, subd. 3) requires the state commission to make "investigations concerning and report upon all matters touching the enforcement and effect of the provisions of this act"; and the next subdivision (4) gives the power to require the production of such public records as it shall require in relation to any matter which it is required to investigate, and confers all the power conferred by the legislative law upon a committee of the legislature, or by the Code of Civil Procedure upon a board or committee, and authorizes it to invoke the power of courts of record to compel such production. Subdivision 5 requires the state commission to make an annual report to the governor, showing its own action, the rules and regulations and the exceptions thereto, and the practical effects thereof, and any suggestion it may approve for the more effectual accomplishment of the purposes of the act.

We must not lose sight of the scheme of the civil service, as embodied in the White law. That law has for its object not only the appointment and promotion of all persons enumerated in the classified service, but the prevention of their removal for partisan reasons. To accomplish the latter object, section 23 was made emphatic. A person may not be removed for political reasons, and it is the duty of all officers to comply with the law. Mere silence is not sufficient to show compliance. The proof must be positive and affirmative, and the people and the person removed must have opportunity to know the causes of the removal, and that it is not on account of political affiliation.

The notice of removal in the case at bar was dated September 1, 1899, and stated that the relator, with eight others, was discharged by resolution of the dock board on that date, in accordance with the opinion of the corporation counsel of August 4th, "as their services are superfluous and unnecessary." The opinion is not contained in the record. The reason for such superfluity of services may be found in the fact that on June 17, 1899, the defendants had appointed as dock masters nine other persons who were not dock masters when the present charter took effect. As the relator and his eight associates were in office as dock masters from the date of the charter, and up to the date of the new appointments, it would seem as if superfluity might have been predicated of the new appointees, and we regard the transaction as one to which the removal inhibitions of the civil-service law especially apply. The result is a clear violation of the spirit of the civil-service law, and the substitution of other persons in the place of the relator and his associates. The civil-service law then in operation on this subject was chapter

186 of the Laws of 1898, which contained the bracketed clause above quoted. This provided that the reasons for removal should be in writing, and filed with the head of the department, and that the person so removed should have opportunity of explanation. It is idle to say that this opportunity of explanation should follow the removal. In construing a statute, the intention of the legislature must be sought. By this act it was clearly intended that before removal opportunity for explanation should be afforded, and until that requirement was complied with there could be no valid removal. This is in accord, also, with section 1543 of the charter, that in every case of removal the true grounds thereof should forthwith be entered upon the records of the department, and that a statement of the grounds of the removal should be filed in the department. The only attempt to prove compliance with these provisions appears in Exhibit C, where it is stated that the service of the relator and his associates are superfluous and unnecessary. The resolution in that exhibit directed the secretary to file in the records of the department "the reason for such discharge," but there is no evidence that the secretary complied with the resolution. It was to prevent just such occurrences that rule 42 provided that no person should be removed "unless and until" the statement of the causes of the removal was filed.

This is not a case where an office or position appears to have been abolished for purposes of economy, such as we have had occasion to consider at the present term of this court, in People v. Scannell (Sup.) 62 N. Y. Supp. 930. The resolution of discharge, by its own words, excludes such reason when it states that the services of the relator were superfluous and unnecessary. This resolution cannot be tortured into a declaration abolishing the office, all the more that the board had previously appointed an equal number of persons to the same positions, and at a larger salary.

Bearing in mind, then, that every officer or employé in the "classified service," and not within the "exempt class," has a right, not "shadowy or unsubstantial," not only to have notice of the grounds of his removal stated, but also to have the causes of his removal filed in the department, we have the duty imposed upon the state commission to see that the civil-service law is not violated by removal for political affiliations. No suggestion is here made of any other way in which this can be accomplished than by a filed official statement of the grounds upon which removals are made, and this was the stated object of the rule.

We think the performance of the duty imposed upon the state commission implies the right to make reasonable regulations to enable it to see that the law is properly enforced. Such a regulation is rule 42, and consequently it has the same force as the provisions of the White law, under which it was promulgated. The rule is explicit, that no removal of a person in the classified service shall be valid "unless and until" the statement of the causes of his removal is made and filed with the municipal commission, and opportunity given to the person to present an explanation in writing.

Since the argument of this appeal, we have received a copy of the opinion of the appellate division of the Third department in People

v. Henry (Sup.; decided Jan., 1900) 62 N. Y. Supp. 102, wherein questions similar to some of those in the present case are discussed. That court reversed an order of the special term granting a peremptory writ of mandamus to restore the relator to her position as general supervisor of the house of refuge at Hudson. It expressly declined to discuss the question "whether the rules promulgated by the state civil-service commission in terms apply to the relator's case or not," and based its opinion on the facts that there was no fixed or definite term of office of the relator; that she was a subordinate female officer or employé of that institution, whose term of office was dependent on the will and pleasure of the general superintendent, subject to the approval of the board of managers; that the legislature had conferred upon the superintendent the power to appoint and remove all subordinate female officers or employés, of whom the relator was one; and that, there being no fixed or definite term of office, the case was governed by section 3, art. 10, of the constitution, which reads as follows:

"When the duration of any office is not provided for by this constitution, it may be declared by law, and if not so declared, such office shall be held during the pleasure of the authority making the appointment."

The court said:

"The authority in this case was the defendant, the superintendent of said house of refuge. Assuming that the rules promulgated by the civil-service commission are in their terms applicable to persons holding positions like those of the relator, it must be obvious that such rules cannot in any way limit or restrain the power conferred by the constitution. To hold otherwise would be to deprive the appointing authority of the power expressly conferred upon it by the section of the constitution I have cited. It therefore becomes of no consequence whether the rules of the civil-service commission were complied with or not. The defendant could have removed the relator without any charges, without assigning any cause, and without giving notice to any person, except the relator herself; because, no duration being fixed for such office by law, she held her position only during the pleasure of the defendant, and when the defendant signified her pleasure that the relator's occupancy should cease that ended her right to hold it."

The case at bar is distinguishable from the Ray Case because the position of the relator Percival was not necessarily terminable at the will of the appointing power. Dock masters in the old cities of New York and Brooklyn seem to have been appointed, in the former under section 718 of the consolidation act (supra), and in the latter under section 2 of title 3 of the charter of that city. By chapter 356 of the Laws of 1886, the comptroller of the city of Brooklyn was authorized to designate one of the dock masters appointed by him to act as superintendent of docks in the city, and two of them to act as assistant superintendents. Section 4 of that act reads:

"The authority and jurisdiction conferred by this act on said dock masters, superintendent and assistant superintendents of docks and on the commissioner of police and policemen, shall cease upon the appointment, nomination and confirmation of a captain of the port of New York and harbor masters as provided by law, or of said captain and a majority of said harbor masters."

The office of captain of the port of New York and subordinate harbor masters has existed for many years. In 1876 a case arose under an act providing for the collection from vessels of certain fees for

the use of harbor masters; and in Steamship Co. v. Tinker, 94 U. S. 238, 24 L. Ed. 118, the supreme court of the United States declared this provision unconstitutional and void, as being a tax on tonnage. After this decision, the legislature, in chapter 461 of the Laws of 1877, authorized the board of police of the city of Brooklyn to detail a suitable patrolman, who should be vested with all the powers, within the city of Brooklyn, which, under the act of 1862, were vested in the captain of the port and harbor masters. The harbor masters, however, seem to have continued to exercise their duties; for the legislature, by chapter 238 of the Laws of 1885, passed an act confirming the acts of the captain of the port and harbor masters, up to May 24, 1884, and declared that from that "time the said offices shall be deemed to have been vacant." Chapter 199 of the Laws of 1888 provided that, when there were no persons appointed and qualified to act as harbor masters, the dock masters appointed by the commissioner of docks of the city of New York should be vested with all the powers formerly vested in the harbor masters, under the act of 1862, and that the "powers hereby conferred shall only be exercised when there are persons duly appointed and qualified to act as harbor masters under the act aforesaid." By this act, the power of dock masters, and, inferentially, the positions, were to cease on the appointment of harbor masters, and thereby the tenure of the position, to a certain extent, was fixed and determinable. It is a matter of public record that no persons have been appointed to these offices since 1888. It cannot be said that these officers held their positions during the pleasure or will of the appointing authority, and when, by section 1536 of the Greater New York charter, they were transferred to the finance department of the city of New York, and subsequently, under the decision of this court, to the department of docks, they held their positions with a term of office whose duration depended, not upon the pleasure or will of the dock department, but upon the appointment of harbor masters by the governor. This fact seems to constitute an additional reason for affirming the order of the special term.

As appears from the statement of facts, this appeal does not involve any conflict of authority or action between the state and municipal commissions. Rule 42 was adopted by the municipal commission, and approved by the state commission. They are in accord. It is only the validity of the removal of the relator by the department of docks that we are to consider. That removal, without notice to the relator and opportunity to be heard, and without causes assigned and filed, was unlawful. It follows that the order appealed from should be affirmed.

Order affirmed, with $10 costs and disbursements.

HATCH and HIRSCHBERG, JJ., concur.

WILLARD BARTLETT, J. (dissenting). The civil-service laws of this state, as they existed in 1898, provided, among other things, that "if a person holding a position subject to competitive examination in

the civil service of the state or of a city shall be removed or reduced the reasons therefor shall be stated in writing and filed with the head of the department or other appointing officer, and the person so removed or reduced shall have an opportunity to make an explanation." Laws 1898, c. 186, § 13. The so-called "White Act," which is now in force, repealed the provision which I have quoted. Laws 1899, c. 370. By rule 42, the municipal civil-service commission has assumed not only to restore the provision thus repealed so far as it applied to the city of New York, but has further declared that no removal of a person in the classified civil service of the city shall be valid until the directions of the provision have been observed; that is to say, until the reasons have been placed on file, and the person has been afforded an opportunity to make an explanation in writing. I do not think that the legislature, when it passed the White act, intended to authorize the municipal civil-service commission or the state civil-service commission to establish a rule in respect to removals from office which the legislature itself by that very enactment repealed. The effect of such repeal was to leave in force the power to remove which was vested in the heads of departments by section 1543 of the Greater New York charter. I cannot believe that it was the intent of the legislature to empower or permit the civil-service commissioners to amend, modify, or repeal the provisions of that section by means of rules adopted to carry out the purpose of the White act.

For these reasons, I am constrained to dissent from the conclusion reached by the Presiding Justice.