## ABRAHAM S. ULLMAN, STATE'S ATTORNEY, EX REL. JULIUS E. LEVINE

*vs.*

## STATE DEPARTMENT OF HEALTH

Superior Court      New Haven County      File No. 61734

MEMORANDUM FILED DECEMBER 31, 1941.

*Harry Koletsky,* and *James Fahy,* of New Haven, for the Relator.

*Harry L. Brooks,* Assistant Attorney General, for the Respondent.

O'SULLIVAN, J.   On November 18, 1941, this court is-sued an alternative writ of mandamus in the above captioned matter.   The writ alleges these facts: the relator is a licensed osteopathic physician, practicing his profession in the City of New Haven.   At various times prior to November 12, 1941, he had sent to the respondent specimens of blood of some of his patients, for the purpose of having a test made for syphilis and he had asked for the findings as to the positive or negative character of the blood.   On all of these occa-sions, the respondent honored the relator's request.   When, however, on November 12th he forwarded two specimens for examination, the respondent refused to make the tests and it still maintains this attitude up to the present time. This, says the relator, is arbitrary and illegal, in view of the statutory duty claimed to rest upon the respondent.

The return admits that the relator is properly licensed to practice osteopathy and that while the blood received prior to November 12th was tested, this was due to error and inadvertance.   It further admits receiving the specimens on November 12th and its refusal to submit them to test. Then, by way of what is intended to operate as a special defense, the respondent alleges that the specimens were ob-tained by the relator's using a hypodermic needle; that this process of drawing blood from the human body is surgery; that the relator has no license to practice surgery; and finally, that were the respondent to make the desired tests, it would amount to the aiding and abetting of a violation of law by the relator.

To this so-called special defense, a demurrer has been addressed which the parties agree presents this legal ques-tion: may the relator take blood specimens from his patients through the use of a hypodermic needle, for the limited purpose outlined by section 1595c of the 1935 Cumulative Supplement to the General Statutes.

This section, passed by the Legislature in 1935, wrought a radical change in the time-honored formalities demanded of those contemplating marriage.   The law now precludes a registrar of vital statistics from accepting an application for a license to marry until he shall receive "a statement or statements signed by a *licensed physician* that each applicant has submitted" to a blood test for syphilis and that "in the opinion of such physician, the person is not infected with

syphilis or in a stage of that disease that may become com-municable and such statements shall be accompanied by a rec-ord of the standard laboratory tests made." (Italics added.) The section continues, "a standard laboratory blood test shall be a test for syphilis approved by the state department of health and shall be performed by said department on request of a *licensed physician.*" (Italics added.)

In 1937, the Legislature passed the following Act: "The term 'licensed physician' [as used in §1595c] shall be con-strued to include a licensed osteopathic physician." (Supp. [1939] §1315e.)

The gravamen of the respondent's argument is this: while the Act of 1937 permits the relator to be classified as a licensed physician, his power to function in that capacity is limited in scope, and the extent of his privilege goes no further than to do what section 1595c permits, namely, to sign statements that a would-be groom or bride has submitted to the required blood test and that in his opinion the person is not infected, etc. Stated in another way, the claim is, that the specimen of blood must be drawn by one licensed to practice surgery, such as, for example, Dr. Doe, and thereafter the relator may for-ward this specimen to the respondent, and upon receiving a report of the laboratory test, the former may then express his opinion in writing as to the condition of the applicant's blood. For, continues the argument, if the relator takes such specimen, he is trespassing on the field of surgery, a right he possesses neither by virtue of his own license to practice osteo-pathy nor from any express authority found in section 1595c. Finally, it is urged, that to permit the osteopathic physician to perform surgery is so contrary to the art and philosophy of osteopathy and to the public policy of the State as formulated by the separation and classification of the healing arts (medi-cine, osteopathy, chiropractic and natureopathy) that the ab-sence of any expressly conferred right to draw blood is highly significant of the legislative intention to preclude the relator and those of his profession from performing this surgical process.

It seems almost needless to say that the judiciary is not con-cerned with the wisdom of either of the Acts in question. The court's task is neither to applaud nor condemn them. Its services have been sought for the limited purpose of determin-ing what the Legislature meant when it said, in 1937, that

the term "licensed physician" as used in the 1935 Act shall be construed to include a licensed osteopathic physician.

There is no more elementary rule of statutory construction than that the intention of the Legislature must govern. The difficulty, of course, lies in discovering that intention. It is not like something tangible that has been lost and will turn up after a little searching around the house. Nonetheless, one is not without helpful aids in the form of rules by which he can eventually locate what he is after.

The intention of the Legislature must primarily be determined from the language it used. However, a court is not confined to the literal meaning of the words, because words must be subservient to intent rather than intent to words. "Where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived," said Chief Justice Marshall. *United States vs. Fisher,* 2 Cranch 358, 386, 2 U.S. (L. ed.) 304, 313. Thus, a broad, general view of the statute must necessarily be taken to get an exact conception of its aim and object, bearing in mind that one ambiguously worded should be so construed as to make it effective in attaining the purpose for which it was passed. *Kelly vs. Dewey,* 111 Conn. 281, 291.

The object of the 1935 Act was to prevent the marriage of anyone afflicted with communicable syphilis. While the Act is, in the main, couched in negative language directed towards registrars of vital statistics and couples contemplating marriage, it sets up, at least by unquestionable inference, the machinery and the source of man power through which shall be determined the condition of the blood of those seeking a marriage license. The man power comes from the ranks of licensed physicians, who, by virtue of their license to practice medicine, needed no special grant of power to draw blood as a necessary incident to the method by which tests for syphilis were to be handled.

Then came the Act of 1937 which adds the osteopathic physician to the man power previously provided for. All osteopathic physicians must now be deemed to be licensed physicians for the limited purpose of accomplishing the object of the Act of 1935. To attain that end, blood must be tested; to test blood, it must be taken from the patient. If the right to perform this preliminary step in the process of testing blood is denied the osteopathic physician, he is, for all practicable

considerations, a useless adjunct to the man power which the Legislature called upon to carry out the purposes of the 1935 Act. This would be like hiring an engineer to run a locomotive and then telling him not to open the throttle.

A rule of statutory construction of great assistance to solve the dilemma confronting the court is that any legislative enactment conferring a privilege or right carries with it, by implication, everything necessary to enjoy that privilege or carry out that right in order to make it effectual and complete. *Saund vs. Saund,* 100 Vt. 387, 138 Atl. 867; *State vs. B. and O. Railroad Co.,* 78 W. Va. 526, 89 S.E. 288; *Newcomb vs. City of Indianapolis,* 141 Ind. 451, 40 N.E. 919; *People vs. Eddy,* 57 Barb. (N.Y.) 593; *Mayor, etc., of N. Y. vs. Sands,* 105 N.Y. 210, 11 N.E. 820; *Bateman vs. Colgan,* 111 Cal. 580, 44 Pac. 238; 2 *Lewis' Sutherland on Statutory Construction* (2nd ed. 1904) §508; 25 *R.C.L. Statutes* §228.

With the use of this rule, any doubt as to what the Legislature meant is dissipated. By the Act of 1937, the osteopathic physician was empowered to do what a licensed physician could do to carry out the purposes of the Act of 1935, and included in this authority is the right to draw blood for the limited purpose of testing it for the limited object of section 1595c.

But, says the respondent, if that conclusion is reached, it will break down the basic distinctions between the healing arts. Surgery, it argues, belongs exclusively to the medical profession and to permit those belonging to another art to engage upon it is contrary to public policy and to the fundamental theory of osteopathy. As to the former, it suffices to say that in a matter of this sort, the Legislature charts the course of public policy and assumes responsibility for its sagacity. As to the latter, it may be said that professions expand or contract as the years roll on. Indeed, at one time only barbers were deemed capable of surgery, if memory serves me right, and yet today surgery—or at least, intentional surgery—has been entirely divorced from the barber's art.

The demurrer admits that the act of drawing blood is surgery, and yet surgery is a difficult thing to define. Webster attempts it in two ways. First, he says, it is the art or practice of healing by manual operation, and secondly, he calls it that branch of medical science which treats of mechanical operative measures for healing diseases, deformities or injuries.

Yet there are many acts which fall clearly within either definition which no reasonable person would ever think of asserting should be performed only by surgeons. Take, for example, the masseur who, by manual operation, relieves a stiff neck or a sore muscle, or the manicure who snips off a deformed cuticle. Perhaps the most apt illustration concerns the chiropodist who pares the corn and the callosity from one's foot. Neither masseur nor manicure nor chiropodist is li-censed to practice any one of the healing arts, and yet each is performing surgery, within the strict definition of the word.

Thus, there are certain activities which are so minor in im-portance as to be ignored as surgery. Perhaps the same thing may be said of the use of a hypodermic needle, especially in view of the class of professional men to whom the right to its use has been given.

For this is not an instance of drawing from the ranks of plumbers, hawkers, or iron workers. An osteopathic physician practices one of the healing arts. To obtain a license he must furnish to a State board satisfactory evidence that he has re-ceived a diploma from a reputable college of osteopathy recog-nized by the laws of the state wherein it is situated. The col-lege must have a course requiring four years of instruction and each year must consist of at least 36 weeks. He must satisfactorily pass an examination as to his qualifications to practice. This examination includes such subjects as anatomy, physiology, pathology, gynecology, obstetrics, chemistry, toxi-cology, hygiene, public health and dietetics.

In view of the scope of such qualifications, there is, it seems to me, no significance to the claim that the Legislature did not intend to extend to the osteopathic physician the privi-lege of performing a minor act of surgery, comparable in degree to the act of the chiropodist. By so doing an exception of limited extent was made to the prohibition found in section 2754 of the General Statutes, Revision of 1930, that "a regis-tered osteopathic physician shall not be authorized to practice surgery."

For the reasons set forth above, the demurrer is sustained.