THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Respondent, v. NATHANIEL SANDS, Appellant.

Courts will take judicial notice of the fact that in the sale of bonds and negotiations for loans in behalf of States, municipalities and governments, aside from their own fiscal agents, other agents are employed.

Under the act of 1871 (chap. 323, Laws of 1371), which authorized the comptroller of New York to create a public fund or stock for certain specified purposes, to be denominated "consolidated stock of the county of New York," that officer had power to employ an agent to negotiate the county bonds provided for by the act, to make an agreement with such agent for his compensation and to pay him out of the proceeds of the bonds.

The provisions of the acts of 1857 (chap. 590, Laws of 1857), and 1870 (chap. 190, Laws of 1870), specifying the method of drawing money from the treasury and prohibiting it from being drawn in any other way, have no application to such an employment.

The fact that an agent, so employed, was at the time a city officer, did not deprive him of the right to receive and retain the agreed compensation.

Where, therefore, it appeared that the comptroller employed one who was at the time a commissioner of taxes to aid in negotiating such bonds, and paid the agreed compensation for the services by transferring to the agent a check received by him as a portion of the proceeds of the bonds, *held* that, in the absence of any evidence of actual fraud or bad faith, an action was not maintainable on the part of the county to recover back the money so paid.

Statutes containing grants of power must be construed so as to include the authority to do all things necessary to make the object of the grant effectual and to enable the donee of the power to accomplish the expressed purposes of the act.

(Argued March 3, 1887; decided April 19, 1887.)

APPEAL from judgmen of the General Term of the Supreme Court in the first judicial department, entered upon an order made March 5, 1887, which affirmed a judgment in favor of plaintiff entered upon a verdict directed by the court and which affirmed an order denying a motion for a new trial.

The nature of the action and the material facts are stated in the opinion.

*Luther R. Marsh* and *Aaron J. Vanderpoel* for appellant. The defendant was not an officer of the county of New York and had the same right to deal with it as any private citizen. (*People* v. *Raymond,* 37 N. Y. 428, 429, 431; *People* v. *Dunlap.* 66 id. 162, 166.) The defendant then being a city officer, and not a county one, was under no obligation to the county, either statutory or otherwise. (*Mayor, etc.* v. *Muzzy,* 33 Mich. 61; *Jackson* v. *N. Y. C. R. R. Co.,* 58 N. Y. 623; *McDonald* v. *Mayor, etc.,* 32 Hun, 89; *McAdam* v. *Mayor, etc.,* 36 id. 340; *Roosevelt* v. *Draper,* 23 N. Y. 318; *Mullaly* v. *Mayor, etc.,* 3 Hun, 661; *Smith* v. *City of Albany,* 61 N. Y. 444.) The comptroller had power, in his discretion, to make the contract with the defendant for the negotiation of the bonds. (Laws of 1871, chap. 583, p, 1268; *Sistare* v. *Best,* 88 N. Y. 527, 534; *People* v. *Van North,* 64 Barb. 205; *People* v. *Green,* 2 T. & C. 62; *Baird* v. *Mayor, etc.,* 96 N. Y. 567, 580.) The plaintiff cannot abandon the fraud and recover as on a contract for money had and received. (*Ransom* v. *Wetmore,* 39 Barb. 104; *Whitcomb* v. *Hungerford,* 42 id. 177; *Salters* v. *Genins,* 3 Bosw. 250; *Place* v. *Minster,* 65 N. Y. 89, 102; *Ledwich* v. *McKim,* 53 id. 307; *Graves* v. *Waite,* 59 id. 155; *Segelken* v. *Meyer,* 94 id. 473.) Defendant was not bound to know that the comptroller had no power to indorse the check to him; and in any event, the city

(county) is estopped from disputing the regularity of the payment. (*McDonald* v. *Mayor, etc.*, 68 N. Y. 23, 28, 29; *Smith* v. *City of Newburgh*, 77 id. 130, 137; *Nelson* v. *Mayor, etc.*, 63 id. 535; *Moore* v. *Mayor, etc.*, 73 id. 238, 246, 247; *Schier* v. *City of Buffalo*, 35 Hun, 564.)

*Charles P. Miller* for respondent. Irrespective of the validity or invalidity of the agreement between Connolly and the defendant, the payment of the check was illegal and void, and he obtained no title to it by such payment. Proof establishing the illegal payment justified the allegations of fraud in the complaint. (*Sup'rs Richmond Co.* v. *Ellis*, 59 N. Y. 620; *Same* v. *Van Clief*, 1 Hun, 454; *People* v. *Field*, 58 N. Y. 504, 505; Laws of 1857, chap. 590, § 6; Laws of 1870, chap. 190, § 6; *People* v. *Ingersoll*, 58 N. Y. 27; *McDonald* v. *Mayor, etc.*, 68 id. 23.) The pretended agreement between the defendant and Connolly was made illegal and void by statutes prohibiting such contracts. (*People* v. *Raymond*, 37 N. Y. 428; Laws of 1870, chap. 137, § 115; *Roosevelt* v. *Draper*, 23 N. Y. 318; *Mullally* v. *Mayor, etc.*, 3 Hun, 661; 62 N. Y. 636, *McAdam* v. *Mayor, etc.*, 36 Hun, 340; 1 R. S. [7th ed.] 858.) The resolution of the board of apportionment does not validate the comptroller's employment of the defendant. (Laws of 1870, chap. 137, § 101; Laws of 1871, chap. 574, § 8.) The pretended contract between the defendant and Connolly was illegal and void at common law. (*Smith* v. *Albany*, 61 N. Y. 44; *Mullally* v. *Mayor, etc., supra; Collier* v. *Munn*, 41 N. Y. 15.) The defendant having moved for a nonsuit, and made no request to go to the jury, cannot now claim that there were any questions of fact to be passed upon by the jury. (*Bridge* v. *Pierson*, 66 Barb. 514; *Trautz* v. *Ireland*, id. 386; *Ormes* v. *Dauchy*, 82 N. Y. 443; *Dillon* v. *Cockcroft*, 90 id. 649.) If the evidence would have warranted a verdict for the plaintiffs, the direction of a verdict was proper. (*McCall* v. *Sun Mut. Ins. Co.*, 66 N. Y, 517.)

RUGER, Ch. J. This action was commenced about the year 1873, in the name of the board of supervisors of the county

of New York, to recover from the defendant the value of a certain check, belonging to the county, alleged to have been misappropriated by the comptroller of New York, and delivered to the defendant. It was further alleged in the complaint that one Connolly was comptroller, and the defendant commissioner of taxes for said city, and that Connolly having received the check in question for the use and benefit of the county, willfully and corruptly, and with intent to cheat and defraud the county, indorsed and transferred it to the defendant, who, wrongfully converted it to his own use, with like intent and purpose, and that after demand duly made upon said defendant, he neglected and refused to repay the moneys received thereon, to the plaintiffs. The defendant answering, denied all of the allegations of the complaint except those specifically admitted, and after admitting the official character of himself and Connolly and the receipt of the check, alleged that the same was duly indorsed and delivered to him by Connolly, in payment for services rendered to Connolly as comptroller, in effecting a loan of money for the city and county of New York, under a contract previously made between them. The complaint did not allege any want of power in Connolly to make such contract, or to transfer the check, or any illegality in its delivery to defendant, except such as might be inferred from the charge, that it was corruptly and fraudulently done.

After the passage of chapter 904 of the Laws of 1874, consolidating the government of the city and county of New York, the mayor and commonalty of the city were substituted as plaintiffs, in the place of the board of supervisors. On the trial a verdict was directed, by the trial court for the plaintiff, but the grounds of the decision do not appear in the record. The defendant duly excepted to the ruling of the court. The General Term affirmed the judgment upon the ground that the act of the comptroller, in paying out the check was contrary to the provisions of chapter 590 of the Laws of 1857, and chapter 190 of the Laws of 1870, which required that all moneys drawn from the treasury, by authority of the board of

supervisors, should be upon vouchers examined and allowed by the auditor and approved by the comptroller, and no money should be drawn therefrom except on a warrant drawn by the comptroller, countersigned by the mayor and clerk of the board.

The court, assuming that the contract with Connolly was a lawful one, and that upon the performance of the services he was entitled to compensation, held that his claim was then nothing more or less than a claim against the county which should be ascertained, adjusted and paid in the mode required by the statutes referred to, and that the receipt and use of the check by defendant, with knowledge of its illegal use by Connolly, was a fraudulent misappropriation of the moneys represented by it, which subjected him to an action to recover the same as for a fraudulent conversion thereof. There was no attempt upon the trial to show any actual fraud intended, either by Connolly or the defendant, but the case was rested altogether upon a fraud inferable, from the alleged illegality of the transaction. The undisputed evidence showed that the draft was paid to the defendant by Connolly in good faith, in satisfaction of a claim held by him against Connolly, as comptroller, for services rendered in effecting a loan of money for the county upon its bonds, to the amount of $15,000,000. The proof was undisputed that the defendant negotiated the loan, and that it was a favorable one; that the commission charged was fair and reasonable, and that the defendant was possessed of sufficient financial ability and influence, to make his assistance valuable and enable him, to obtain the loan upon terms advantageous to the county.

It was further shown that the services were rendered in pursuance of a contract previously made with the comptroller, to the effect that he should have one-half of one per cent for effecting such loan, provided it was made upon favorable terms, and without other expense to the county. The transaction between Connolly and the defendant sprang out of the effort of the former to execute the power conferred, and duty imposed upon him by chapter 323 of the Laws of 1871, which

authorized and empowered the comptroller of New York to create a public fund, or stock, to be denominated " consolidated stock of the county of New York," and by which any holder of the present stock of the county of New York, or bonds of the said county of New York, was authorized to exchange the same for said consolidated stock, upon such terms and conditions, as should be determined and offered by said comptroller; such stock was also authorized to be issued to pay off and cancel any bonds or stock of said county falling due in the year 1871, and also to meet the requisitions on the county of New York, by the State for payment of the bounty debt in that year. Such stock was to be in the form designated by the comptroller, and signed by the comptroller and mayor of the city, and sealed with the seal of the board of supervisors of the county, and attested by the clerk of said board. All stock of the county of New York thereafter issued was to be known as " consolidated stock of the county of New York," and to be issued under the authority of that act. In pursuance of the authority thus conferred, the comptroller issued the bonds in question and procured them, through the assistance of the defendant, to be negotiated with A. Belmont & Co. at a premium of four and one-half per cent.

No question is made as to the legality of this issue, or but that the whole proceeds of the bonds, including premiums, excepting the check in question, were applied to the purposes of the county, or paid over to its treasurer by the comptroller. It would be difficult to conceive of a grant of power conferred in broader or more comprehensive language, and which could be less restricted by conditions and limitations upon an agent's authority. No limit is imposed upon the amount of bonds to be issued, except that implied from the use to which they were to be devoted, and no restriction as to the terms upon which they were to be disposed of, or the amount of the expenses to be incurred in their preparation, negotiation and transfer is found in the act. The comptroller was broadly charged with the duty of creating a public fund or stock to

be denominated "consolidated stock of the county of New York'" and whatever power was necessary to enable him to perform this duty was necessarily conferred upon him by the act. Whether this was a wise or prudent grant of power, or whether in the exercise of it, the comptroller was enabled to commit abuses or frauds upon the people of the county with impunity, is not a subject for our consideration. We find the law upon the statute book and it is subject to the same rules of construction, as other statutes thus appearing. Citizens of the State having occasion to deal with the comptroller in reference to the subject-matter of the act, had the right to rely upon its provisions, and the authority apparently conferred upon him, to bind the fund or principals represented by him.

It is obvious from the language of the act, as well as the evidence in the case that heavy liabilities of the county, were becoming payable in the immediate future, and that large amounts would be required to meet its obligations, and that it was considered desirable, not only to raise the money required without delay, but also that all the county's outstanding indebtedness should be funded at the same time, and put upon a uniform basis as to the time of its redemption and its rate of interest. The occasion was exceptional and extraordinary, and large and apparently almost unlimited power was therefore given to the comptroller to accomplish this object. Whenever money was required to satisfy the indebtedness of the county, he was not only authorized, but was charged with the duty, of providing by a sale of the bonds of the county, and whenever an exchange of the consolidated stock could be effected for the outstanding stock or bonds of the county, he was authorized to do it, upon such terms and conditions as should be determined by himself. It was contemplated that enormous sums of money should pass into his hands, and its application and security were entrusted wholly to the judgment, discretion and integrity of the comptroller In the performance of the duties cast upon him, he was made independent of all other county authority, or supervision, and

was broadly charged with the responsibility of providing funds, not only to meet the current and maturing debt of the county, but to fund all of the outstanding obligations. The moneys to be raised on the bonds, whether in premiums or principal, were undoubtedly the property of the county and the comptroller's duty required him, except so far as they might be required for the legitimate purposes of the act, to account to the treasurer of the county for the proceeds.

It is a matter of public history, of which courts will take judicial notice, that in the sale of bonds, and negotiations for loans in behalf of States, municipalities and governments, the services of their own fiscal agents are usually, if not invariably, supplemented by the employment of bankers, brokers and other financial agencies to aid in raising moneys for public purposes. During the late war the Federal Government raised large sums by the issue and sale of treasury notes and bonds, which would have been practically difficult, if not impossible, but for the assistance rendered by extraneous financial agencies employed and paid by the secretary of the treasury. Most, if not all of the acts authorizing such loans, contemplated such services and authorized the secretary to pay for them, sometimes at a fixed rate, sometimes at rates not exceeding a certain limit, and often according to his judgment and discretion. Appropriations were sometimes, but not always, made in the acts for the payment of these expenses. (See U. S. Stat. at Large, vol. 12, p. 129, chap. 5, Laws of 1861; vol. 12, p. 345, chap. 33, Laws of 1862; vol. 12, p. 709, chap. 73, Laws of 1863; vol. 15, p. 13, chap. 13, Laws of 1864; vol. 15, p. 465, chap. 177, Laws of 1865.

It is a matter of common knowledge that such loans, in all countries of the world, are usually negotiated through agencies outside of the regular financial authorities of the government making the loans. Whether their employment in the case in hand was wise and prudent, or perhaps even necessary to the accomplishment of the object intended by the statute, cannot be determined as a question of law, for the statute gave the comptroller power to determine that question in his own dis-

cretion, subject only to the. obligation to do so honestly and in good faith. Under these circumstances the question is presented, what were the duties of the comptroller and the extent of his power in carrying out the law. It is a well established principle that statutes containing grants of power shall be construed, so as to include the authority to do all things necessary to accomplish the object of the grant, and to enable the donee of the power to effect the purpose of the act. Domat expresses the idea as follows : " All laws necessarily bear with them all the powers or incidents necessary to carry out their intention." (Sedgwick Const. and Stat. Laws, p. 245.) Sedgwick says, " When a statute commands an act to be done, it authorizes all that is necessary for its performance." (Sedgwick, 228.) Potter's Dwarris states the rule to be : " In statutes, incidents are always supplied by intendment, in other words, whenever a power is given by statute, everything to the making of it effectual is given by implication, for the maxim is, " *Quando lex aliquid concedit, concedere videtur et id per quod devenitur ad illud.*"

The rule has been frequently referred to and applied in the reports of this State. It was. stated by Judge RUGGLES, in *Stief* v..*Hart.* (1 N. Y. 20), as follows : " Whenever the law requires an act to be done, it authorizes the agent to do what is necessary to accomplish it in the mode pointed out for its performance." In this case, power in the sheriff to take goods out of the hands of a pledgee, for the purpose of a sale on execution, was implied from the authority given him to levy upon and sell the interest of the pledgor in such goods.

In *People* v. *Hicks* (15 Barb. 160), it was held that a statute giving power to a magistrate to examine such witnesses as might be produced before him, authorized him to issue subpoenas for such witnesses and to compel their attendance by the usual process of the Court. Judge EDWARDS, giving the opinion of the court, says : " In an anonymous case reported by Lord COKE (12 Coke, 130), he says that, on a motion made by him before the justices of the Kings Bench, it was unanimously resolved : ' That when the statute gave power to

justices of the peace to require any person or persons to take the oath, the law impliedly gave them power to make a warrant to have the body before them.'" Judge ROOSEVELT also, says: "That the grant of an express power carries with it by necessary implication every other power necessary and proper to the execution of the power expressly granted." (1 Kent's Com. 404.)

The existence of the power in question is so indisputable that it is unnecesary to pursue the discussion of the question further, and it is material only upon this point to add a few observations in relation to the necessity of paying the expenses of the loan, to enable the comptroller to carry out the provisions of the law. Certainly the necessity of raising the money provided for by the act, to accomplish its purposes cannot be denied. The members of the legislature were the sole judges of this necessity, and having themselves determined that question, it became the duty of the comptroller to execute the mandate of the law. Whatever he judged it necessary in good faith to do in carrying out its purpose, it was lawful for him to do, provided he did not transgress any positive provision of law, or violate the purpose or spirit o the act. The statute conferred upon him large discretionary powers in carrying out its provisions, and he could not be made liable for errors of judgment or abuse of his powers unless they were fraudulently or illegally performed.

The necessity of incurring some expenses in the negotiation of the loans and placing the bonds authorized to be issued is, in view of the universal practice in such cases, too plain to admit of dispute, and it is obvious that, unless the comptroller was vested with power to pay them, the whole purpose of the act might be defeated at its outset.

The comptroller had no general authority to contract a debt for such purpose on behalf of the county, and no special authority, except such as is inferable from the act in question. It is also plain that if he could not obtain the assistance required, or the services necessary by a pledge of the credit of the county, subjecting the agent employed to the risk of an

unfavorable consideration of his claims by the board of supervisors or other auditing officers of the county, he would be obliged to adopt other means to accomplish the object intended. Can it be reasonably said that the power to pay expenses from the fund raised, was any more detrimental to the interests of the county, than the power to pledge its credit? If the possession of one power is to be inferred from the act, is there not equal reason to say, that, if its exercise is required for the purposes of the law, the other power was equally inferable? They both rest on the same principle and are governed by the same rule, and one power is as equally open to abuse as the other.

The comptroller was directed to create a public fund, and his power was commensurate with the requirements of the task imposed upon him.

It is unreasonable to say that in imposing the duty of raising the money in question upon him, the legislature intended to hamper and restrict his performance of it, by denying to him the means necessary to perform it, or that its scheme was subject to be defeated, by the neglect or refusal of the county officers to provide funds to execute its provisions.

The act contains no reference to the intervention or co-operation of any county officers in its execution, and it is repugnant to established principles of construction to import into its provisions requirements of prior enactments, not pertinent thereto, and which would be plainly destructive of its purposes.

Such was the view taken of the act by the board of apportionment, organized under chapter 583, Laws of 1871, as expressed in resolutions adopted May 9, 1871. Such board, in authorizing an issue of about $9,000,000 of the consolidated stock of the county under said act, to meet a portion of its indebtedness, provided, that "the expenses incurred in providing for the issue of said stock, should be paid out of the premiums received for the same." And, in the same act, in providing for a board of apportionment, whose general authority

over the finances of the county was intended to supersede that of the board of supervisors, the legislature expressly exempted the comptroller in the exercise of the powers conferred upon him by chapter 323, of the act of 1871, from the authority and control of the board of apportionment, and the prohibition therein contained against the incurring of liability by any officers of the county of New York exceeding the appropriation made for such purpose. (§ 10, chap. 583, Laws of 1871.) The statutes referred to in the opinion of the General Term seem to us to have no application to the subject. They provide, among other things, that no money shall be drawn from the treasury except upon previous application for that purpose, and in terms, apply only to moneys already placed in the treasury of the county, and disbursable in the regular and customary administration of its affairs, *upon the authority of the board of supervisors.* The check in question never reached the treasury of the county, and, although, it may have been the property of the county, it was still in the hands of Connolly subject to the purposes of the act by which he acquired its possession. He was, by such act, made the agent of the county with power to disburse so much of its funds in his hands, as was necessary to carry out the purpose of the law by which he was appointed.

We are, therefore, of the opinion that the courts below erred in holding that the comptroller had no authority to pay out the check, and we are further of the opinion that no cause of action was proved against the defendant. We think that no right of action exists against the defendant in respect to this transaction, except upon proof of collusion between him and Connolly to defraud the county of the money represented by the check.

We deem it unnecessary to refer at length to a contemporaneous act, similar in form to the one under discussion, authorizing the comptroller to create a public fund or stock, to be denominated "Consolidated stock of the city of New York," as its introduction would tend only to complicate the questions discussed. The complaint alleges that the check

was the property of the county, and the proof tends to establish that it was received in payment of a part of the premium due upon a loan to the county.  The city could not, therefore, have had any legal interest in its disposition or recovery.

It is claimed by the respondent that, inasmuch as the contract between Connolly and Sands provided for the payment of the same commission for negotiating city, as well as county bonds, the defendant came under the provision of section 115 of chapter 137 of the laws of 1870, prohibiting city officers from being directly or indirectly interested in any contract, work or business, or the sale of any article, the expense, price or consideration of which is paid from the city treasury. The proof fails to show that Sands rendered any services to the city or made any claim against it in respect to this check.

If the contract, so far as it provided for payment of services rendered the city was void, we think it was divisible and could be enforced, so far as it was authorized by law.  The parties in fact did separate it, and no performance was attempted, except in relation to the county loan.

We think it was competent for a city officer to render services to the county or any other employe outside of the city and charge and receive a compensation for such services.

We have examined other objections made to the right of Sands to retain the compensation in question, arising out of the fact that he was a city officer, but think the authority upon which they are based too obviously inapplicable to call for special discussion.

There is no evidence in the case upon which the plaintiff showed any right to recover, and it was, therefore, error for the trial court to direct a verdict in its favor.

The judgments of the courts below should, therefore, be reversed and a new trial ordered, with costs to abide the result.

All concur, except ANDREWS and FINCH, JJ., dissenting.

Judgment reversed.