HORACE B. CHURCH, JR., Appellant, v. HERBERT S. HADLEY et al.

In Banc, March 1, 1912.

1. **STATE DEBT: Unforeseen Emergency: Burning of Capitol.** The burning of the State capitol is an "unforeseen emergency" within the meaning of the language of section 44 of article 4 of the Constitution authorizing the General Assembly "on the occurring of an unforeseen emergency" to submit to the people a proposition to issue bonds the proceeds of the sale of which are to be used in erecting a new capitol.

2. **STATE CAPITOL BONDS: Commissions Allowed to Brokers: Sale at Par.** The Board of Fund Commissioners have authority to allow a reasonable commission to bond brokers for selling the $3,500,000 of three and one-half per cent bonds authorized by the General Assembly and the approval of the people in 1911 to be issued for the purpose of raising money to build a new capitol, where the commissioners have made reasonable efforts to sell the bonds at par without paying any commission and have failed. While the statute says said bonds shall be sold "for not less than par," it also says that "it is estimated that the proceeds will aggregate the sum of three and one-half million dollars, more or less," and the two expressions read together mean that the bonds are to be sold at par, but after a sale at par the fund commissioners may pay to bond companies a reasonable commission as a necessary expense of making the sale.

3. ————: ————: ————: **Implied Powers: Existing Emergency.** Where an agency of the State is invested with general powers to effect the sale of State bonds, issued in an emergency to raise money to rebuild the capitol destroyed by fire, and has exhausted the usual means of exercising that power, then there is a clearly implied power to make such reasonable contracts for securing purchasers of the bonds as their judgment dictates. Although the agency be public, yet where there is an express grant of a general power, and an emergency exists, that grant carries with it, by necessary implication, every other needful and proper power to the execution of the power expressly granted. The authority to sell State bonds carries with it the power, in case of an emergency and where the usual means of exercising it have proved inefficient, to secure such reasonable and proper assistance as may be necessary to bring about an advantageous sale of the bonds.

*Held*, by LAMM, J., concurring, that the authority of the Board of Fund Commissioners to pay a commission to bond brokers for selling the bonds at par exists only when the legislative acts themselves make it clear that an emergency exists which will not tolerate delay, and the commissioners have without avail exhausted the usual methods of selling the bonds without paying a commission; then there exists in the general grant of powers given to them to sell at not less than par, the implied power to call to their assistance any reasonable aid that will accomplish the purpose of that general power, and to pay for such assistance as a necessary expense.

Appeal from Cole Circuit Court.—*Hon. John M. Williams,* Judge.

AFFIRMED.

*W. C. Irwin* and *Silver & Dumm* for appellant.

(1) The acts of the Forty-sixth General Assembly, approved March 16, 1911, and March 24, 1911, and the method therein adopted for the issuance of State bonds to create a fund for the building of a new State capitol, were not authorized or warranted by the provisions of section 44, article 4 of the State Constitution. The destruction of the State capitol by fire did not create an emergency within the meaning of the Constitution authorizing the creating of the State liability and the issuance of the bonds in question in this proceeding. The Act of March 16, 1911, does not recite that there existed any casual or other deficiency of the State revenue rendering necessary the invoking of the special means provided in section 44, article 4 for raising additional State revenue. The power to so raise revenue as provided in the constitutional provision under consideration is a special and limited one, and is to be strictly construed.

When invoked the facts authorizing its exercise should clearly and fully appear, and the same not so appearing in this case, the two acts of the Forty-sixth

General Assembly, supra, and under consideration, were unauthorized. Being so unauthorized because not warranted by the Constitution, the bonds the defendants purpose to issue would have no validity or sanction in law, and their issuance and sale should be permanently enjoined and restrained as asked by appellant. (2) The payment of a commission to agents or brokers for their services in selling the bonds is unauthorized and contrary to law, that is, to the express mandate of the act of the Forty-sixth General Assembly approved March 16, 1911, providing for their issuance and sale. That act expressly provides that the bonds shall be sold by the Board of Fund Commissioners, *"but for not less than par."* The payment out of the proceeds of the sale of the bonds of a broker's commission for services in connection with their sale would be an evasion of the requirement of said act and a violation both of its terms and spirit. The act evidently contemplates and in fact expressly provides that the entire proceeds of such sale or sales shall be paid into the "capitol Building Fund," "to be applied exclusively for the purpose of building a new State capitol at the present seat of government, including the furnishing and other equipment of said building and the purchase by the State of additional capitol premises adjoining those now owned by the State." The General Assembly could undoubtedly make an appropriation out of the general revenues of the State to pay such broker's commission if the General Assembly should deem the same proper and necessary, but the payment of such commission directly out of the proceeds of the sale of the bonds would to that extent reduce and diminish the capitol building fund, and is manifestly contrary to the intent and purpose of the General Assembly as well as to the language and terms of the act. This court has ruled that a court of equity will not be permitted to accomplish indirectly what

the law will not permit to be done directly. Stowe v. Stowe, 140 Mo. 594.

*Elliott W. Major,* Attorney-General, and *Charles G. Revelle,* Assistant Attorney-General for respondent.

(1) The issuance of the State capitol bonds was duly authorized and they are in all respects valid. *a.* The decision of the Legislature that this occurrence constituted an unforeseen emergency within the meaning of the constitutional clause is conclusive and cannot be reviewed, especially after such decision has been concurred in by more than two-thirds of the people, that is, by "the common sense of the country." *b.* If the first proposition is incorrect, and this is a judicial question to be judicially determined without regard to the legislative assertion thereon, then, as a matter of fact, the destruction of the capitol building was such an occurrence as should be so judicially determined. An "emergency" is defined as a sudden or unexpected happening, an unforeseen occurrence or condition. Century Dictionary; Sheehan v. New York, 75 N. Y. Supp. 803; Webster's Dictionary; People v. Board of Supervisors, 21 Ill. App. 274. The definition, when applied to the term as here used, necessarily involves the idea of a decision as to whether immediate action was necessary, and whether delay would be detrimental to the public interests. These are wholly questions of public policy to be determined by the Legislature. Stevens v. United States, 2 Ct. Cl. 95; U. S. v. Speed, 75 U. S. (Wall.) 77; In re Application of Shelton St. Ry. Co., 69 Conn. 628. In the Matter of Wm. A. Fowler, 53 N. Y. 62; Park Comrs. v. Armstrong, 45 N. Y. 243; Aldrich v. Spears, 101 Mo. 406; State v. Baird, 98 Mo. 219; Freeman v. Thompson, 53 Mo. 192; Bridge Co. v. Stone, 174 Mo. 22; State ex rel. v. Thomas, 183 Mo. 229; Cooper v. Hunt, 103 Mo. App. 16; Baker v. United States, 3 Ct. Cl. 343; Cobb v.

United States, 9 Ct. Cl. 291. According to section 56, article 4, section 1, article 5, sections 9 and 10, article 6, capitol buildings are required to be maintained for the use and benefit of State officers and the public, and the court will judicially notice that such buildings are indispensably necessary for the administration of public affairs. The Legislature, having declared that it was "for the good and welfare of the commonwealth, and for the government and ordering thereof, and of the subjects of the same," that immediate steps be taken toward building this public necessity, it is not for the court to declare otherwise. Munn v. Illinois, 94 U. S. 113; State v. Swaggerty, 203 Mo. 527; State ex rel. v. Hayes, 49 Mo. 607; County v. Griswold, 58 Mo. 192; Slack v. Jacobs, 8 W. Va. 612. This legislative decision that such action was necessary and urgent is further fortified by the concurrence of the people, and the law regards as necessary that which "the common sense of the country" so regards. Commonwealth v. Railroad, 801 Ky. 296; Commonwealth v. Nesbitt, 34 Pa. 409. If this question were for judicial determination, without regard to any legislative assertion thereon, the court could but declare that this event constituted an unforeseen emergency. Viterbo v. Friedlander, 120 U. S. 707; People v. Comrs., 21 Ill. App. 271; Sheehan v. City, 75 N. Y. Supp. 802. (2) The payment of a reasonable compensation to extraneous agencies for effecting a sale or negotiation of said bonds is authorized. The petition recites that, although the sale of the bonds has been thoroughly advertised, both in and out of the State, defendants have been and will be unable to dispose of same at par except with the assistance of extraneous financial agencies employed and paid therefor. The authority to do this is not conferred in express terms, but the act which was passed by the Legislature and ratified by the people, contains the following provisions: "Said bonds . . . shall be sold to the best advantage by the

board, and for not less than par." At the same time this act was passed and ordered submitted to the people, a companion measure was passed to be effective upon the ratification of the one first named. This act provided a method and machinery for the construction of a new capitol, and contained the following clause: "Said proceeds are hereby appropriated to the construction of the State capitol referred to in this act . . . and to otherwise carrying out its purposes and provisions, and also the purposes and provisions of the act . . . to be ratified by the voters of this State." In addition to this, the act of the Legislature ordering the special election and submission of the bond question, contains this clause: "Emergency— that the recent destruction by fire of the State capitol of this State, and the consequent necessity for the building of a new State capitol without delay to replace the former structure, creates an emergency for the taking effect of this act immediately on its passage and approval." From these provisions we deduce the following:. *a.* That the Legislature and the people have ordained that for the public welfare the new capitol shall be constructed with all possible speed and without delay. *b.* That to the accomplishment of this end the sale of bonds to the extent of three and a half million dollars is indispensably necessary. *c.* That defendants are expressly charged with the duty of selling these bonds and securing this necessary fund without delay. *d.* That they are required to do whatever is reasonably necessary to sell the bonds "to the best advantage," and, in doing this, their discretion is subject to but one limitation, viz.: that same shall not be sold at less than par. Upon these express powers and mandatory duties, and the averment in the petition that defendants have been and will be unable to comply therewith without the assistance alluded to, we unhesitatingly assert this incidental power is one of necessary implication. The rule by which the au-

thority of officers to make contracts is determined is well settled, and is, that where there is an express grant of power to them it carries with it by necessary implication every other power needful and proper to the execution of the power expressly granted. 23 Am. & Eng. Ency. Law 364, 365; Sutherland's Stat. Const., secs. 341, 343, 344; 2 Beach, Pub. Corps., secs. 3 and 14; State ex rel. v. Perkins, 139 Mo. 118; State ex rel. v. Gates, 67 Mo. 143; Edwards v. Thomas, 64 Mo. 468. That there is a clear distinction between, on the one hand, a sale at par with the payment of the selling agent's commission out of the proceeds, and, on the other hand, a sale at less than par, although the net results to the vendor are the same, is manifest. Manitou v. Bank, 37 Colo. 349; Whelen's Appeal, 108 Pa. St. 162; State v. Land Co., 75 Minn. 467; Village v. Fish, 156 N. Y. 372; County v. Railroad, 32 Pa. St. 152.

GRAVES, J.—Plaintiff, a resident taxpaying citizen of this State, by his bill in equity, seeks to enjoin the "Board of Fund Commissioners" of the State, which said board is made up of the Governor, Attorney-General, State Auditor and State Treasurer, (1) from in anywise disposing of all the unsold bonds directed by acts of the General Assembly to be sold for the purpose of erecting a new State capitol building and purchasing additional grounds therefor, and (2) especially enjoining said "Board of Fund Commissioners," constituted aforesaid, from entering into a contract with Francis Brothers & Company, or any other person, persons, copartnership or corporation, by which contract the said Francis Brothers & Company, or any other person, persons, copartnership or corporation shall be allowed or paid any commission for services rendered in selling and disposing of said bonds.

The petition also has a prayer for general relief.

The petition sets out and pleads the three several acts of the General Assembly of this State, by which he avers an attempt is made to authorize the issuance and sale of $3,500,000 State bonds, due in thirteen years, bearing interest at 3½ per cent, for the purposes aforesaid. The petition further avers that the legislative act received, at a special election called therefor, more than two-thirds of the votes cast at such election, and such result was duly ascertained and proclaimed. The legislative acts referred to and set out in the petition will have to be discussed in the opinion and further details may well be omitted at this point. The petition then thus proceeds:

"That the defendants hereto, as said Board of Fund Commissioners aforesaid, have caused said bonds, hereinbefore mentioned, to be printed, engraved, prepared and executed in the form and with the recitals required and provided for in said Act of the Forty-sixth General Assembly of Missouri, approved March 16, 1911, and hereinbefore set out and referred to, and have advertised by public notice in the press of the State and otherwise, said bonds for sale at not less than par.

"That by reason of the fact that they bear an annual rate of interest of only three and one-half per centum a year, said board has been able to dispose of only two hundred and eighty thousand dollars in amount of said bonds, and the remainder thereof, aggregating the sum of three million two hundred and eighteen thousand dollars ($3,218,000), said board is unable to dispose of at par, and will be unable to so sell and dispose of the same at par except on the payment of a commission of between four and five per centum of the proceeds of the sale or sales of said bonds to an agent or broker for his services in

making the sale or sales thereof and in connection therewith.

"That said Board of Fund Commissioners have received from the firm of Francis Brothers & Company, brokers of the city of St. Louis, Missouri, an offer to take at par the entire amount of said bonds so unsold, aggregating $3,218,000 in amount, and to dispose of and to sell the same to a buyer or to buyers, provided said Board of Fund Commissioners will allow and pay to said Francis Brothers & Company a broker's or an agent's commission of 4.21 per centum of the proceeds of the sale of said bonds payable out of the same.

"That plaintiff concedes that said commission, if legal (which plaintiff denies), is a reasonable one and probably the lowest commission for which said bonds can be disposed of.

"That the defendants hereto, as said Board of Fund Commissioners, are about to and will conclude and consummate with said Francis Brothers & Company a contract of the character above indicated; that is, to take and dispose of said bonds at par, said Francis Brothers & Company to be paid the aforesaid commission for their services in selling said bonds, and in connection therewith, payable out of the proceeds of the sale thereof, unless said board and the members thereof shall be hindered and restrained from so doing by this Honorable Court.

"Your petitioner states that the issuance and sale of said bonds in the manner contemplated by said Board of Fund Commissioners, as hereinbefore indicated, will be wrongful, invalid and illegal.

"Because the Board of Fund Commissioners of this State is without legal or competent authority under its Constitution and laws, to sell or to dispose of its said bonds aggregating in amount the sum of $3,218,000; the power and authority purported to be conferred on said board so to do, being inadequate and

insufficient in law and not authorized by the Constitution of this State or by laws passed pursuant thereto or in conformity therewith."

The prayer was as above indicated. In the circuit court the defendants constituting the "Board of Fund Commissioners" demurred to this petition in this language:

"Now comes the defendants, Herbert S. Hadley, Governor of Missouri; John P. Gordon, State Auditor; Elliott W. Major, Attorney-General, and James Cowgill, State Treasurer, constituting the Board of Fund Commissioners of the State of Missouri, and demur to the petition filed by plaintiff herein and assign as grounds of demurrer the following:

"First. Said petition fails to state facts sufficient to constitute a cause of action.

"Second. There is no equity on the face of the bill filed by complainant herein.

"Third. Said petition and the matters and things therein, as stated and set forth, are not sufficient in law or in equity, to entitle the plaintiff to the relief prayed for in the petition, nor to authorize the issuance of a restraining order or injunction prayed for therein.

"Fourth. Because the petition, upon its face, disclosed that the said defendants are authorized, under the laws and Constitution of the State, to issue and sell the bonds mentioned in said petition, and have the right and authority to pay a reasonable commission under the conditions and circumstances stated in said petition.

"Wherefore, defendants, for the reasons herein stated and covered, pray that the petition be dismissed, and that they be permitted to go hence without day and for costs."

This demurrer the circuit court sustained and entered its judgment accordingly. From such judgment

the plaintiff has appealed and the cause reaches this court for final determination.

I. By an act approved March 16, 1911, the General Assembly of Missouri, so far as it could, authorized the issuance and sale of $3,500,000 in State bonds and in the same act (Laws 1911, p. 251) said:

"The proceeds of said sale or sales shall constitute a fund to be designated as the capitol building fund, and shall be applied exclusively to the building of a new State capitol at the present seat of government of the State, including the furnishing and other equipment of said building and the purchase by the State of additional capitol premises adjoining those now owned by the State."

Under the Constitution, article 4, section 44, this act had to be submitted to a vote of the people. Such act was duly submitted by a second act approved March 24, 1911, and the petition admits that it was adopted by the required vote. The plaintiff charges, however, that the Act of March 16th, supra, was not authorized by the Constitution and that therefore the issuance and sale of any of the bonds therein authorized would be unlawful. To this contention we do not assent. Section 44 of article 4 of the Constitution reads:

"The General Assembly shall have no power to contract or to authorize the contracting of any debt or liability on behalf of the State, or to issue bonds or other evidence of indebtedness thereof, except in the following cases:

"*First*, In renewal of existing bonds, when they cannot be paid at maturity, out of the sinking fund or other resources.

"*Second*, On the occurring of an unforeseen emergency or casual deficiency of the revenue, when the temporary liability incurred, upon the recommendation of the Governor first had, shall not exceed the sum of two hundred and fifty thousand dollars for any one

year, to be paid in not more than two years from and after its creation.

"*Third*, On the occurring of any unforeseen emergency, or casual deficiency of the revenue, when the temporary liability incurred or to be incurred, shall exceed the sum of two hundred and fifty thousand dollars for any one year, the General Assembly may submit an act providing for the loan, or for the contracting of the liability, and containing a provision for levying a tax sufficient to pay the interest and principal when they become due (the latter in not more than thirteen years from the date of its creation), to the qualified voters of the State, and when the act so submitted shall have been ratified by a two-thirds majority, at an election held for that purpose, due publication having been made of the provisions of the act for at least three months before such election, the act thus ratified shall be irrepealable until the debt thereby incurred shall be paid, principal and interest."

The Act of March 16th is clearly authorized by the third exception in the section of the Constitution, supra.

The act itself declares the unforeseen emergency to be "the destruction of the State capitol by fire." The liability incurred exceeded $250,000. The act provides for a tax sufficient to pay the interest and principal when they become due. By the act, the bonds do not run longer than thirteen years and may be paid in eight years. The act is drawn in strict compliance with the provisions of the Constitution. Plaintiff contends that the power to raise revenue under the provisions of the Constitution is a special and limited one and is to be strictly construed, and that the destruction of the State capitol by fire did not create an emergency within the meaning of that constitutional provision. We could concur in the views of plaintiff to the effect that this provision of the Constitution must be strictly construed, and yet upon other grounds be forced to dis-

allow his claim. Giving the Constitution the strictest construction, it cannot be said that the burning of the State capitol, the raising of the necessary funds required to rebuild the same, is not just such an "unforeseen emergency" as the Constitution-makers had in mind when they adopted that instrument; if not, then we are at a loss to understand the term "unforeseen emergency." Public buildings of this character are absolute requisites, and we feel that the unforeseen and sudden destruction of a State capitol and the immediate demand for funds with which to replace the same, is clearly an emergency such as contemplated by the constitutional provision supra. This contention of plaintiff is therefore overruled.

II. The next question urged presents more difficulties, but in that we think the plaintiff is in error. The petition says that the "Board of Fund Commissioners" has tried to sell these bonds at par; that they have advertised them for sale both in and out of the State; that such board has only been able to find buyers for a very small portion thereof; that such board is now threatening to employ Francis Brothers & Company to assist them in finding purchasers who will buy from said board the remainder of such issue at the par value thereof and is threatening to contract with said Francis Brothers & Company to pay them for their services in procuring purchasers of such bonds at par a commission of 4.21 per cent of the proceeds of such sale out of such proceeds. The question, therefore, is, can a contract to pay a commission for procuring purchasers for these bonds be made by the board? We think so. First, it is a conceded fact that the defendants have tried to find purchasers and have failed. This might have been expected owing to the exceedingly low rate of interest ($3\frac{1}{2}$ per cent) which the bonds bear, and owing to the further fact that the members of such board are not in position to

find purchasers, as would be some established brokerage company, with a clientele all over the country. Such boards are not usually in touch with the great mass of persons who invest in such securities. A large issue of bonds of this character might be sold to the clientele of any large brokerage firm, in small quantities to each client. Such companies usually have and can find persons among their customers who could be easily induced to take one or more of such bonds even at a low rate of interest, but this would require work. What a brokerage firm could do in this way, the usual board charged with the sale of low rate bonds could not do. Again we say that the question is, Can this board, after having tried to perform the duties imposed upon it in the matter of selling these bonds, and after having failed to sell them, employ and pay a broker or brokerage firm a stipulated reasonable sum to find and procure purchasers who will take these bonds at their face value?

The power to make such a contract must be gathered from the laws of the State. There is no express provision of this law which authorizes the making of such contract, but we think the power, under the admitted facts herein, is clearly implied.

To get at the legislative intent of the powers of the Board of Fund Commissioners, we must go to all of the law relating to the given subject. We have thus far spoken of the Act of March 16, 1911, which authorized the issuance and sale of $3,500,000 of State bonds, and the Act of March 24, 1911, which submitted the first named act to a vote of the people, but on March 24, 1911, there was another act approved which created the "State Capitol Commission Board" and providing for its selection, organization, duties, etc.

The Act of March 16 provides that the bonds shall not be sold for "less than par," but in the last act mentioned above in section 10 thereof, we have this significant language (Laws 1911, p. 114):

"That if the act of the Forty-sixth General Assembly, to be submitted to the voters of this State, referred to in the next succeeding section of this act, shall be ratified by two-thirds of the legally qualified voters of this State, voting at an election held for that purpose, and it thereby becomes a valid and binding law, and the bonds authorized by said act are issued and sold pursuant thereto, the entire proceeds of the sale thereof shall be paid into the State capitol building fund, the[n] said proceeds (*which it is estimated will aggregate the sum of three and one-half millions of dollars, more or less*) shall be and the same with all interest accruing therefrom, are hereby appropriated to the construction of the State capitol heretofore referred to in this act, to the purchase of additional State capitol premises as contemplated by this act, and to otherwise carrying out its purposes and provisions, and also the purposes and provisions of the act of the Forty-sixth General Assembly of this State to be ratified by the voters of the State and referred to in the next succeeding section of this act."

We have italicized the significant portion. This portion gives the legislative construction of what was meant by a sale at not less than par. It gives a legislative construction as to what the proceeds of such a sale might be. It shows that the General Assembly had in mind that although it had authorized and decreed the sale of $3,500,000 at "not less than par," yet such sale when made might bring net proceeds of less than $3,500,000. What did the Legislature mean when it estimated the proceeds of the sale of $3,500,000 bonds at not less than par at "more or *less*" than "three and one-half million dollars?" That body knew that it had conferred powers upon the "Board of Fund Commissioners" in general terms, and that there would be some expenses attached to the issuance and sale of these bonds, and that if the sale could only be effected at par, then the net proceeds would be less than three

and one-half million dollars. It also knew that if the said board were fortunate enough to sell the bonds for more than par the proceeds might be above that sum. If the Legislature did not have in mind that the expenses necessary to a sale should be taken out of the money, there is no sense in the use of the term "more or *less.*"

But in addition to this the same section appropriates this net sum *"more* or *less"* than three and one-half million dollars to the construction of a State capitol, to the purchase of additional premises, "and to otherwise carry out its purposes and provisions, and also the purposes and provisions of the act of the Forty-sixth General Assembly of this State to be ratified by the voters of the State and referred to in the next succeeding section of this act."

The power granted in this law is to sell bonds. The limitation of the power is that the actual sale shall not be less than par. The power of sale is granted in general terms, in so far as the means of sale is concerned. The statute granting the power does not undertake to prescribe the means and manner of sale.

In State ex rel. v. Gates, 67 Mo. 1. c. 143, SHERWOOD, C. J., thus announces the fixed rule in such cases: "If there is one principle in the law which finds abundant and oft repeated recognition, it is this: that where an agent is clothed with general powers, the means and measures necessary to effectuate the powers granted, attend the grant of authority as inevitable incidents. [Edwards v. Thomas, 66 Mo. 468.] Thus, an agent employed to get a bill discounted may, unless expressly restricted, indorse it in the name of his employer; a broker employed to effect a policy of insurance may adjust the loss and do all that is requisite towards such adjustment; an agent employed to issue process may receive the debt and costs, and, in general, *an agent has implied authority to use those means of which the principal could not but have fore-*

*seen the necessity, and therefore could not but have intended to authorize* (Smith, Merc. Law, 175, 76, and cases cited); and the same principle which applies to private agents *is equally applicable in this regard to public ones."*

The italics are ours. In this case we have a command to sell bonds to meet an emergency. Quick action is required. The whole trend of the several acts so shows. The power is granted in general terms, with but one single limitation, i. e., the *actual* sale must be at not less than par. Before the sale, bonds must be printed at a cost, yet there is no specific authority to incur this cost. There is certainly the implied power given this board to make such a contract as an incident to the power of sale. Bonds can't be sold without public notice and these publications cost, and contracts for such have to be made. This, too, is a necessary incident to the power conferred to sell. Nothing is said as to the means and methods to be employed in procuring purchasers, yet it is clear that the State (the principal in this case) contemplated that, in this emergency, some effective means should be used to secure purchasers who would take these bonds at not less than par. The declared emergency of the case required speedy and effective action. Under such circumstances it is clear that the lawmaking power must have had in mind that if the ordinary and usual methods of sale diligently pursued and prosecuted, as in this case, had failed, then more active and heroic measures and means might be required and might be used by the board to make the sale to meet the public exigency and emergency. The Legislature was confronted with an emergency and was enacting a law to provide for the same. Under such circumstances bills are hurriedly drawn and ofttimes in general terms, leaving incidental powers to be implied from the general and specific powers granted.

We do not mean to say that this act would necessarily by implication authorize the "Board of Fund Commissioners" to resort to extreme methods to sell in the first instance, but what we do mean is that the law imposes upon them a duty to perform to meet an emergency; that if such board exhausts the usual means of exercising the power (as has been done in this case) then there is a clearly implied power to make such reasonable contracts for the securing of purchasers as the judgment of such board dictates, and in such contracts to provide for the payment of a reasonable sum for the aid given in finding and procuring purchasers willing to buy such bonds from the board at a price not less than par.

Let us take the other side of the question. Suppose the "Board of Fund Commissioners" had advertised for purchasers. Suppose that such board had received bids for all of the issue at par. Suppose the judgment of the said board, in consideration of the condition of the money market, was such that they thought in the exercise of their discretion better bids could be gotten if they could interest some large financial agent with a nation-wide clientele and would in the exercise of their discretion contract with such agent to pay him a commission on the bonds sold at the rate of 4.21 per cent if such agent would find for such board a purchaser or purchasers who would take these bonds at five per cent above par, would it be the duty of such board to employ these means? We think so. If it had made such a contract would it be beyond the spirit of these several acts? We think not. In both instances the board would simply be exercising a power incidental to and a part of the general power granted. If the supposed contract would not be void for want of power, the threatened contract cannot be held void for want of power, dealing with statutes which breathe emergency from beginning to end, as we are in this case.

Thus far, we have not discussed the case law, but have confined our suggestions to the laws themselves and the rationale thereof. We take next the case law upon the subject.

III. We are not without persuasive case law upon this question. In the case of Village of Fort Edward v. Fish, 156 N. Y. 363, we have a discussion of implied powers in cases of this kind. That case was a suit to recover back for the village the sum of $1750 paid to Fish. Fish had bought of the water commissioners of the village $50,000 of bonds of the village at less than par. The commissioners finding a better purchaser declined to deliver. The new purchaser refused to buy until Fish's alleged claim was cleared up so that the title would be unquestioned. By way of compromise the commissioners paid Fish the $1750 and this suit was to recover it back. This is but explanatory, but in the course of the opinion the question before us was discussed. In that case the commissioners were authorized to sell such bonds, but not to sell them "at less than the par value thereof." The power to sell with this limitation was in the case. In this case both the power and the limitation are as in the case at bar. The court in the course of its remarks, said: "What were their implied powers? Having made a contract that was expressly prohibited by law, had they implied power to get rid of that contract by a compromise? Implied power can be inferred only from the general scope of the actual power and the necessity of doing something essential to the efficient exercise thereof. The actual power was to borrow money by issuing and selling bonds at not less than par. The express power to issue bonds involved the implied power to pay for engraving, printing and the like. The express power to sell bonds doubtless carried with it the implied power to pay counsel for an opinion as to the validity of the bonds, as was done in

this case, and possibly to pay a commission to brokers for selling the bonds. These expenses were incidental to the duty imposed and fairly came within the scope of the main power. But from what is the power to make the compromise in question to be implied? The contract was void and could not be enforced. There was no implied power to get rid of it, for, being void, it could not stand alone in court, and any effort to enforce it would meet with defeat."

It will be observed that the court holds that from the express power to sell followed these implied powers, (1) to contract for printing, engraving and the like, (2) to pay counsel for an opinion on the bonds, and (3) to pay a commission to brokers for selling the bonds. It will be noticed that the latter is not emphasized in this opinion because it was not involved in that case.

But we have a later case in which this question is involved, and which cites with approval this doctrine. In this later case of Armstrong v. Village of Ft. Edward, 159 N. Y. 315, PARKER, C. J., quoted with approval the language we have quoted above. In the Armstrong case the plaintiff was suing for commission alleged to be due him for selling waterworks bonds. The same power to sell existed as in the Fish case. In fact the same bonds were sold. The water commissioners were charged with the sale as in the Fish case. Armstrong lost his case, both in the lower court and in the Supreme Court, but the judgment was reversed by the Court of Appeals. In the course of his opinion, Chief Justice PARKER said:

"The contract that was declared void in the case of Village of Ft. Edward v. Fish, 156 N. Y. 363, related to a portion of the bonds that this plaintiff claims to have assisted in selling. While the question there presented is a very different one from that involved in this case, nevertheless this court did have occasion to consider the implied powers of the water commis-

sioners. Said the court at page 372: 'The actual power was to borrow money by issuing and selling bonds at not less than par. The express power to issue bonds involved the implied power to pay for engraving, printing and the like. The express power to sell bonds doubtless carried with it the implied power to pay counsel for an opinion as to the validity of the bonds, as was done in this case, and possibly to pay a commission to brokers for selling the bonds. These expenses were incidental to the duty imposed and fairly came within the scope of the main power.' This last case calls attention to the rule by which the authority of officers, such as the members of this board of water commissioners, to make contracts may be determined. Where there is an express grant of power to them it carries with it, by necessary implication, every other power needful and proper to the execution of the power expressly granted. *The authority to sell water bonds, therefore, carries with it the authority to secure such reasonable and proper assistance as may be requisite to bring about an advantageous sale of the bonds.* It is suggested that the rule permits the employment of brokers only to sell the bonds, but it is not so confined. It was not a broker that was selected in Mayor, etc. v. Sands, 105 N. Y. 210, and it quite frequently happens that men who are not brokers, and never have been, have such relations that they can dispose of bonds fully as advantageously as brokers. Those having charge of the selling of bonds have the right to exercise their discretion in selecting the agencies by which they shall make disposition of them, but in the selection of such agencies it is their duty to exercise their best judgment in the interests of the public whom they serve. The selection, therefore, must be made in good faith and with a fixed purpose to further the interests of the constituency represented."

The italics are ours. In this very case (both cases refer to the same village and the same bonds), the

water commissioners were unable to get par and contracted to sell the $50,000 at less than par and thereby
made the void contract, involved in the first suit, but
by the assistance of Armstrong actually sold their
bonds (including the $50,000 contracted to Fish discussed in the Fish case) for five per cent above par.
It was with reference to this assistance from Armstrong that these remarks were made.

In the Armstrong case, supra, Chief Justice
PARKER also said:

"(1)   Did the board of water commissioners have
the power to employ the plaintiff?

"(2)   Did the plaintiff assist in bringing about
the sale?

"(3)   If he did, were the services performed with
the understanding between the board and himself that
he should be paid for them?

"The answer to the second and third questions
must be found in the testimony, but the authorities
dispose of the first question. Mayor, etc. v. Sands, 105
N. Y. 210, was an action brought to recover moneys
paid to an agent for selling the bonds of the City of
New York, the agent being at the time one of the municipal officers, namely, a commissioner of taxes. It
was held that the courts will take judicial notice of
the facts that in the sale of bonds and negotiations for
loans in behalf of States, municipalities and governments, aside from their own fiscal agents, other agents
are employed, and that the fact that an agent so employed was at the time a city officer did not deprive
him of the right to receive and retain the agreed compensation. But it should be observed that while the
agent was a city officer he was in nowise connected
with the department of government charged with the
sale and disposition of the bonds. In the course of
the opinion Chief Judge RUGER said: 'It is a matter
of public history, of which courts will take judicial
notice, that in the sale of bonds, and negotiations for

loans in behalf of states, municipalities and governments, the services of their own fiscal agents are usually, if not invariably, supplemented by the employment of bankers, brokers and other financial agencies to aid in raising moneys for public purposes. During the late war the Federal Government raised large sums by the issue and sale of treasury notes and bonds, which would have been practically difficult, if not impossible, but for the assistance rendered by extraneous financial agencies employed and paid by the Secretary of the Treasury.' In Brownell v. Town of Greenwich, 114 N. Y. 518, the court said, in speaking of the action of the commissioners in turning the bonds over to another person for sale: 'It was not necessary that merely executive acts, not involving the exercise of discretion, should be done by the commissioners personally, but such acts might be done by another under their direction.' [Citing Mayor, etc. v. Sands, supra.] 'When a statute commands an act to be done, it authorizes all that is necessary for its performance. . . . Hence the commissioners could lawfully employ Mr. Andrews as a broker to sell the bonds and invest the proceeds according to their instructions.' ''

So we say in the case at bar, the Legislature no doubt anticipated that occasion might arise for more heroic action than the mere efforts of its own fund commissioners, and therefore indicated that the actual proceeds of the sale might be decreased by necessary expenses which might have to be incurred, and might be "less" than three and one-half million dollars. They wisely provided, however, that the interest accumulating upon this fund should go to and become a part of the fund, which interest will much more than offset the expense of selling the bonds.

It has been held, and we think rightfully, that although there is an express power given to pay a commission for the sale of bonds, yet such power does not authorize the allowance of that commission to a pur-

chaser of the bonds. [Appeal of Whelen, 108 Pa. St. 162.] This case, however, does not reach the question here. In Mayor, etc. v. Sands, 105 N. Y. 210, we have a full discussion of the question of emergency being an element to be considered in determining the necessity of using outside assistance in procuring the sale of a large bond issue (four times the amount involved here) and other bonds shortly to mature. The emergency there was not greater than the emergency here. That court held, and we think rightfully, that such was properly an element to be considered in determining the powers of the State's sales-agents in the method and means to be adopted by them in the sale of such bonds.

In Manitou v. First National Bank, 37 Colo. 344, we have another case in point. In that case there was given by the statute a general power to sell bonds, but such bonds must "not be sold for less than their face value." The case stated is this: "August 4, 1897, the town of Manitou, through its board of trustees, agreed in writing to pay M. A. Leddy $1200 for his services in placing or selling at par an issue of its waterworks refunding bonds amounting to $40,000. An unsuccessful attempt to dispose of the bonds had been previously made." Note that the contract called for a sale at par and for such sale at par the agent should be paid $1200. The suit was a contest over the legality of the warrants issued in payment of this $1200. The Colorado court, after quoting from the Fish case, supra, as we have quoted above, said:

"We believe that the above states the law to be applied to this case, and that, under the facts disclosed by this record, the contract made by the board of trustees with Mr. Leddy to pay him a commission for his services was within the implied powers of the municipal corporation; that the same was not *ultra vires* or illegal, and that the warrants issued in pay-

ment of the services rendered under the contract were valid and binding obligations of the municipality.

"We are not without support in this conclusion.

"The Supreme Court of Minnesota, discussing the provisions of a statute of that State similar to the provisions of our statute, section 4548b, supra, in State v. West Duluth Land Co., 75 Minn. 456, at page 467, said:

" 'Under the provisions of section 4; chapter 289, Laws 1895, a sale of the bonds issued thereunder *at less than par value was forbidden*. The bonds now under consideration, $140,000 in amount, were turned over to a broker for sale under a written contract with the board of county commissioners. In this contract, it was stipulated that the broker should pay for lithographing and printing the blank bonds, for legal advice and services, and all other expenses incident to a sale, for which, and as compensation in full, he was to receive the sum of $14,000—ten per cent of the face value of the bonds sold. On these facts we are asked to hold that there was a plain violation of section 4, and that the bonds are void. There might be cases where the facts would very conclusively show that an agreed compensation of ten per cent for the sale of the bonds was a palpable evasion of such a section, but we have no such case before us. We cannot say, as a matter of law, that, under the conditions of this contract, there was a violation of section 4, which forbids a sale of the bonds at less than par.' "

The case from Minnesota relied upon by that court was in point there, as it is likewise in point here.

We are therefore of opinion (1) that the whole issue of $3,500,000 bonds in this case is fully authorized by our Constitution, (2) that the legislative acts relating thereto are within constitutional bounds, (3) that the several legislative acts have been fully complied with, (4) that the facts of this case show a full and adequate effort upon the part of the Board of

Fund Commissioners to sell these bonds without outside assistance, and (5) that under such facts there is from the legislative acts, supra, a clearly implied power, which authorizes such board to enter into a contract with some financial agent to procure for such board a purchaser or purchasers who will take such bonds at their par value, and in such contract to agree to pay and pay such agent, out of the proceeds of the sale, a reasonable commission for the services rendered.

The plaintiff by his petition states that the commission mentioned is a reasonable commission. The demurrer of course admits that fact. Upon that question we need not pass. The real purpose of this proceeding is to test the question as to whether or not a commission can be paid by the Board of Fund Commissioners to some financial agent for procuring purchasers for these bonds. It was so argued orally and is so briefed. We hold that the Board of Fund Commissioners have the right to contract to pay a reasonable commission for such services. Such board must exercise its best discretion in that matter. It is the duty of the board to get as favorable a contract as it can, all things considered. In such board is lodged a limited discretion which must be used in the interest of the State in the dealings which it has in connection with the subject-matter embraced in these several legislative acts. Such discretion must be used by the board in determining the reasonableness of the commission to be paid. From all this it follows that the judgment, *nisi*, was right and it is affirmed.

All concur, except *Brown, J.*, who concurs in the first paragraph of the opinion, but dissents to the remainder thereof, and the result; *Lamm, J.*, concurs in a separate opinion.

## CONCURRING OPINION.

LAMM, J.—The close question in the case is that discussed in the second paragraph relating to the right to pay a commission to expert brokers in touch with barreled up · money seeking investment. As to the legality of the bonds decided by the first paragraph we all agree. There are other questions discussed in the second paragraph relating to other incidental outlays on which there is no divergence of opinion, but the shoe pinches, as said, on the right to pay a broker's commission to aid in procuring a par buyer.

It was argued that the right to pay such commission was necessarily implied in any bond issue for city, state, school, road, drainage or any other purpose for which an issue of bonds is provided by statutes or charters, unless the payment of such commission is directly forbidden by law. That is, that the officers, agents or municipalities selling such bonds had the implied power to pay such commission in every case of a bond issue where the power is not expressly denied. That is a dangerous doctrine I do not subscribe to, and the opinion of my brother does not adopt that view of it. It may be some of the cases and authorities cited, in a broad way, sustain that contention, or head that way, but our brother's opinion *stands on all of the facts of this particular case.* The salient fact is a crying emergency in this State demanding a strong and quick remedy. All of the acts in *pari materia* show that such emergency must be read into the legislative purpose and breathes there in every line. The records of this State are menaced by destruction from fire unless safely housed in suitable vaults. To that controlling emergency may be added other subsidiary facts and indications in aid of the opinion got at by analysis of the terms of the statutes, as shown by the opinion.

It was argued that we should hold a specific proposed contract with a named brokerage firm at a named figure would be legal. But the opinion does not hold that the board is authorized to make any specific contract with any specific broker at any named price. It holds, as I read it, that the board has authority to make some reasonable contract with some suitable brokers to assist in the sale of the bonds, if such assistance is necessary and only then. The Board of Fund Commissioners is rightly left to judge of that necessity as their informed judgments acting under the solemn sanction of their several official oaths may direct. They must assume and carry the responsibility for the proper exercise of the discretion we find is lodged in them.

It was argued that, if we sustained the right of this board to pay a commission, hereafter no public bonds of any sort would be sold in this State without paying a commission, and scandals would arise over unnecessary losses suffered by the people. But the opinion opens no door for such mischief to enter and vex the people, for its language must be read with the peculiar existing facts creating a present emergency whereby a remedy became necessary. I think the power to pay a commission springs only from an emergency creating such necessity and that such necessity is within the intendment of the statutes.

It was further argued that if we sustained the power of this board to pay a commission, then the board would at once proceed to do so on the theory that the facts exist at this immediate time requiring the board to pay such commission. In other words the board, armed with or incited by our opinion, would cease all efforts on its own part to make a sale and would at once contract to pay for the aid of brokers holding an "open sesame" to hoarded money. That it would make no further effort by personal interviews or advertisements or individual efforts in the east or

State ex rel. v. Walker.

elsewhere where bond investments are sought and interest runs low.

But that is an argument to be addressed to the board, and the matter rests with their judgment and their conscience. It may safely rest there. The opinion does not tell them to stop all effort to sell the bonds without paying a commission, and the honorable officers charged with the duty of selling these bonds doubtless will exhaust every sensible or available means of avoiding the payment of a commission. The presumption is they will do their duty, and pay none except as a last resort when they are at the end of their row.

For these reasons and those stated by my brother, I concur. *Graves, Ferriss, Woodson* and *Kennish, JJ.,* concur in this concurrence.